**Don DeWIT, High Line Pork, Robert Cash, Dan Murphy, and Double V Dairy, Plaintiffs,**

v.

**FIRSTAR CORPORATION, Firstar Bank Milwaukee, N.A., Firstar Bank Wausau, N.A., Firstar Bank Sioux City, N.A., and Mark J. Miley, Defendants and Third–Party Plaintiffs,**

v.

**Lee Van VELDHUIZEN, Third–Party Defendant.**

No. C 94–4052.

United States District Court,
N.D. Iowa,
Western Division.

Aug. 29, 1995.

---

1480

Randall A. Roos of the Roos Law Office, P.C., Sioux Center, Iowa, for Plaintiffs.

Thomas L. Shriner, Jr., and G. Michael Halfenger of Foley & Lardner, Milwaukee, Wisconsin, and Jeffrey L. Poulson of Corbett, Anderson, Corbett, Poulson, Flom & Vellinga, Sioux City, Iowa, for Defendants.

MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFFS' MOTIONS FOR RECONSIDERATION AND LEAVE TO FILE AMENDED COMPLAINT AND DEFENDANTS' MOTIONS TO STRIKE

## TABLE OF CONTENTS

I. PROCEDURAL AND FACTUAL BACKGROUND ...................... 1482
 A. Procedural Background .......................................... 1483
 B. Factual Background ............................................. 1485
 1. Securities Allegations ...................................... 1486
 TABLE I: Comparison Of Securities Allegations In The First And Second Amended Complaints .................................. 1486
 2. RICO Allegations ........................................... 1489
 TABLE II: Comparison Of RICO Allegations In The First And Second Amended Complaints .................................. 1490
II. LEGAL ANALYSIS ................................................ 1493
 A. The Motion For Reconsideration ................................ 1493
 1. Applicable standards ....................................... 1494
 a. Rule 59(e) motion to alter or amend ...................... 1494
 b. Rule 60(b) motion for relief from judgment ............... 1496
 2. Reconsideration here ....................................... 1498
 a. Reconsideration in light of controlling precedent ......... 1498
 i. The disregarded precedent .......................... 1498
 ii. Import of the precedent ............................. 1499
 iii. Irrelevance of the precedent to this court's ultimate determination ....................................... 1500
 b. Reconsideration of failure to include leave to amend ...... 1501
 i. Opportunity to replead after dismissal ............... 1502
 ii. Leave to amend here ................................ 1505
 3. Summary Regarding The Motion For Reconsideration ........... 1507
 B. Adequacy Of The Second Amended Complaint .................... 1507
 1. Repleaded securities claims ................................ 1507
 a. Commonality ............................................ 1509
 i. Horizontal commonality .............................. 1509
 ii. Vertical commonality ................................ 1513
 b. Expectation of profit from the effort of others ............. 1514
 2. Repleaded RICO claims ..................................... 1516
 a. A proper RICO enterprise ................................ 1516
 i. Association-in-fact enterprises ....................... 1516

**1482**

ii. Enterprises consisting of parents and subsidiaries....... 1520
iii. The enterprise alleged here .......................... 1521
b. Pattern or racketeering..................................... 1523
c. Predicate acts ......................................... 1524
i. Mail, wire, and common-law fraud..................... 1524
ii. Bankruptcy fraud.................................... 1525
3. Summary of disposition of the motion for leave to amend ........ 1525
C. Interlocutory Appeal ......................................... 1525
III. CONCLUSION ............................................... 1527

BENNETT, District Judge.

In its prior order dismissing the complaint in this litigation, *DeWit v. Firstar Corp.*, 879 F.Supp. 947 (N.D.Iowa 1995), the court observed that this lawsuit, asserting claims pursuant to RICO and securities laws, raised a number of probing and nettlesome questions. Now, confronted with plaintiffs' motion to reconsider its prior ruling and for leave to file a second amended complaint, the court finds itself once more among the nettles.

Plaintiffs particularly take the court to task for its conclusion, in dismissing the first amended complaint, that the cattle feeding contracts at issue here are not securities as a matter of law. Plaintiffs assert that the court's error in dismissing the securities claim is made even more apparent in the repleading of that claim in the proffered second amended complaint. However, rather than standing upon the RICO allegations made in the first amended complaint, the plaintiffs have submitted drastically altered allegations concerning the definition of the "RICO enterprise" in their proffered second amended complaint. Plaintiffs have thereby dramatically changed the inquiry concerning the adequacy of the pleading of their RICO claims.

Plaintiffs, investors in and suppliers to a cattle investment scheme called "Adventure Cattle," filed this lawsuit against a bank holding company and subsidiary banks that provided banking services for Adventure Cattle, its principal, John Morken, and Morken's related business, Spring Grove Livestock Exchange (SGLE), and against the bank officer responsible for the accounts in question. In a first amended complaint, plaintiffs alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), the Securities Acts of 1933 and 1934, and also asserted state common-law claims of fraud and wrongful conversion or set-off. The court granted defendants' motion to dismiss the first amended complaint for failure to state a federal claim upon which relief can be granted and declined to exercise supplemental jurisdiction over state law claims. Plaintiffs now move the court to reconsider dismissal of the first amended complaint, arguing that the court made factual and legal errors in dismissing the first amended complaint and should have granted plaintiffs leave to file a second amended complaint to cure the defects the court perceived in the first amended complaint rather than simply dismissing it. Plaintiffs subsequently filed, as a supplement to their motion for reconsideration, a "second amended complaint" in order to demonstrate that their claims could be pleaded with sufficient particularity. Defendants resist the motion to reconsider, asserting that the court rightly dismissed the first amended complaint. Defendants further challenge either the filing or consideration by the court of the second amended complaint. In the event that the court considers the adequacy of the second amended complaint, defendants argue that it fails to cure the critical flaws identified by the court in the first amended complaint. Defendants therefore argue that plaintiffs should be denied leave to file the second amended complaint on the ground that the amendment is futile.

## I. PROCEDURAL AND FACTUAL BACKGROUND

The procedural and factual background for this lawsuit is discussed extensively in the court's prior ruling. *See DeWit v. Firstar Corp.*, 879 F.Supp. 947, 954–959 (N.D.Iowa 1995). The court will therefore present here only procedural matters arising since the court dismissed the first amended complaint

and the new factual allegations of the proffered second amended complaint.

### A. Procedural Background

By order dated March 1, 1995, this court dismissed plaintiffs' second amended complaint pursuant to *Fed.R.Civ.P.* 12(b)(6) for failure to state a claim upon which relief can be granted. The court held that: (1) plaintiffs' RICO claim failed to plead sufficiently the elements of a RICO offense under 18 U.S.C. § 1962(c); (2) plaintiffs failed to state claims of securities laws violations, because the Adventure Cattle contracts at issue are not "securities" under the test articulated by the Supreme Court in *Securities and Exchange Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and therefore were not subject to the securities laws; (3) plaintiffs' state law claims of common-law fraud did not meet the heightened pleading requirements for fraud under *Fed. R.Civ.P.* 9(b); and (4) the court should decline to exercise supplemental jurisdiction over the only surviving state-law claim, for wrongful conversion or set-off, because all federal claims had been dismissed.[1]

On March 9, 1995, plaintiffs moved the court to reconsider the dismissal of the first amended complaint. In that motion for reconsideration, plaintiffs assert that the court dismissed the first amended complaint in large part because the complaint lacked sufficient particularity. Plaintiffs argue, however, that the infirmities can be cured, and that the court should have allowed plaintiffs thirty days within which to file an amended complaint. Plaintiffs also contend that the court improperly departed from precedent of the Eighth Circuit Court of Appeals in holding that the Adventure Cattle contracts were not securities, but do not identify in their motion what that precedent was. Plaintiffs filed no brief in support of their motion for reconsideration at the time of its filing, but instead requested twenty days within which to file a memorandum and thirty days within which to file a second amended complaint.

Defendants responded to the motion to reconsider on March 22, 1995. In their resistance, defendants attack plaintiffs' motion to reconsider as failing to state with particularity the grounds therefor as required by *Fed. R.Civ.P.* 7(b)(1). Defendants suggest that if plaintiffs could indeed cure the defects in the first amended complaint, they should have submitted a proposed amended complaint. Defendants then argue that plaintiffs' motion fails to articulate or demonstrate compliance with the standards for reconsideration of a ruling or to state or satisfy the grounds for amendment of a complaint. Defendants contend that plaintiffs' proper course was to pursue an appeal of the dismissal of their first amended complaint.

Plaintiffs next filed a reply to defendants' resistance on March 27, 1995. In that reply brief, plaintiffs assert that it would be an abuse of discretion for the court not to permit plaintiffs to amend their complaint after its dismissal, but they cite no authority for that proposition. Rather, plaintiffs assert that leave to amend pursuant to *Fed.R.Civ.P.* 15(a) should be freely given. Plaintiffs argue that they could not attach an amended complaint to the motion to reconsider, because they first had to seek modification of the court's March 1, 1995, ruling to allow them to file an amended complaint. They also argue that they had inadequate time to file such an amended complaint between the time the court summarily dismissed the complaint and the deadline for filing a motion to reconsider the dismissal. Plaintiffs contend that huge numbers of documents obtained in discovery since the filing of the first amended complaint would allow them to cure any pleading deficiencies with a second amended complaint. Plaintiffs filed an affidavit of counsel in support of this contention. The reply brief then addresses the merits of reconsideration as to one of the court's conclusions, asserting that in *Booth v. Peavey Co. Commodity Servs.*, 430 F.2d 132 (8th Cir.1970), the Eighth Circuit Court of Appeals held that only vertical commonality, not horizontal commonality, was a requirement of a "securi-

---

1. The court declined, however, to dismiss the claim of wrongful conversion or set-off pursuant to *Fed.R.Civ.P.* 12(b)(7) on the ground that indispensable parties had not been joined, because the court concluded that the identified parties, the trustees of Morken's and SGLE's bankruptcy estates, were not "necessary" parties under *Fed. R.Civ.P.* 19(a).

ty," and that this court improperly departed from that decision in its ruling.

On April 24, 1995, plaintiffs filed a supplement to their motion to reconsider and motion for leave to file an amended complaint consisting of a proposed second amended complaint. Whereas the first amended complaint was twenty-two pages and sixty-seven paragraphs long, the second amended complaint is seventy-five pages and one hundred thirty-six paragraphs long. Plaintiffs summarize the changes as including the following: (1) repleading of the RICO enterprise as an association in fact of the Firstar banks and Firstar Corporation with new allegations as to the common purpose of the enterprise and the means employed to achieve that purpose; (2) specification of the RICO defendants as Miley, Firstar Milwaukee, Firstar Wausau, and Firstar Corporation and addition of two new RICO defendants, Alfonso Buscemi and Roberto Vinent, both officers of Firstar Milwaukee; (3) pleading of three specific fraudulent banking schemes and their interrelatedness as demonstrating a RICO "pattern"; and (4) "clarifying" the horizontal and vertical commonality of the Adventure Cattle program and facts in support of plaintiffs' securities claims founded on Rule 10b–5.

Although they had twitted plaintiffs for failing to file an amended complaint, on May 3, 1995, defendants moved to strike plaintiffs' proffered second amended complaint as untimely and inappropriate.[2] Defendants assert that any "supplement" should have been filed with the motion for reconsideration within ten days of the judgment and cannot now be used to support the vague and conclusory motion to reconsider, which itself failed to comply with *Fed.R.Civ.P.* 7. Defendants also argue that the supplemental affidavits of counsel and a former bank employee filed in support of plaintiffs' reply brief present only facts known to the plaintiffs prior to dismissal of the first amended complaint and therefore provide no ground for reconsideration under *Fed.R.Civ.P.* 59. In their brief, defendants then provide a thumbnail sketch of arguments that the proposed second amended complaint is futile, but seek leave to brief that issue more fully.

Plaintiffs resisted the motion to strike on May 22, 1995.[3] Plaintiffs assert that their original motion to reconsider was timely and presented with sufficient clarity plaintiffs' argument that the court made factual and legal errors that could be resolved by the filing of a second amended complaint. They also assert that they filed a brief in support of the motion to reconsider within the twenty days of filing of the motion itself, as they had requested leave to do, even though the court had not granted that part of their motion requesting an extension of time to file such a brief.[4] Plaintiffs assert that because they agreed with defendants' statement that a proposed amended complaint would help clarify matters, they filed such a proposed amended complaint. However, plaintiffs contend that the silence of the March 1, 1995, ruling on leave to amend meant that plaintiffs could not file such an amended complaint until they had first obtained leave to do so through a motion for reconsideration and modification of the March 1, 1995, ruling.

Plaintiffs then assert the adequacy of the new allegations in the proposed second amended complaint. Plaintiffs contend that the revised pleading of the RICO enterprise and the more detailed pleading of the predicate acts are sufficient to sustain the RICO claims over objections made pursuant to *Fed. R.Civ.P.* 12(b)(6). They also contend that the Adventure Cattle program "was not accurately portrayed in the Court's March 1, 1995, ruling in several important particulars," and that the repleaded allegations will allow the court to correct its errors. The nature of the repleaded allegations is considered in greater detail below in the court's discussion of the factual background for this decision.

On May 30, 1995, defendants submitted a brief in opposition to the proposed second

---

2. An identical copy of this motion was filed on May 5, 1995.

3. The overlength brief was actually ordered filed on July 12, 1995.

4. The court assumes that plaintiffs are referring to their brief, designated a "reply" to defendants' resistance to the motion to reconsider, which was filed on March 27, 1995.

amended complaint.[5] Defendants assert that neither the RICO nor the securities claims as repleaded state claims upon which relief can be granted. Even as repleaded, defendants contend, the Adventure Cattle scheme lacked either horizontal or vertical commonality, and did not provide an expectation of profits solely from the efforts of others, such that the underlying contracts could not be securities. Defendants contend that the repleaded RICO allegations still do not identify a proper RICO enterprise or a pattern of racketeering. Thus, defendants contend that the second amended complaint fails as futile.

The court held oral arguments on these pending motions on June 1, 1995. At the oral arguments, plaintiffs were represented by counsel Randall A. Roos of the Roos Law Office, P.C., in Sioux Center, Iowa. Defendants were represented at the oral arguments by counsel Thomas L. Shriner, Jr., and G. Michael Halfenger of Foley & Lardner in Milwaukee, Wisconsin, and Jeffrey L. Poulson of Corbett, Anderson, Corbett, Poulson, Flom & Vellinga, in Sioux City, Iowa. The oral arguments were spirited and informative. In light of those arguments and the parties' written submissions, the court now turns to a more detailed discussion of the factual background for this case.

### B. Factual Background

Because of the procedural posture of this case, the court will here identify differences between the facts as alleged in the first amended complaint and as alleged in the plaintiffs' proffered second amended complaint. In the event the court determines that it should consider the proffered second amended complaint, the factual allegations of that amended complaint will be treated as

required under *Fed.R.Civ.P.* 12(b)(6) and the standards for post-dismissal amendment to determine whether the second amended complaint is only a futile attempt to cure the deficiencies found in the first amended complaint.

Like the first amended complaint, the second amended complaint is in five counts.[6] Count I of the second amended complaint, as did Count I of the first amended complaint, alleges a violation of the provision of the Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. § 1962(c), which pertains to interest in or control of a RICO enterprise, but adds alleged violation of 18 U.S.C. § 1962(d), which prohibits conspiracy to violate any of the other provisions of § 1962. Counts II and III again allege violations of the Securities Acts of 1933 and 1934. The gravamen of Count II is that Firstar Milwaukee[7] was a "seller," along with Morken, of unregistered securities in the form of Adventure Cattle investment contracts in violation of §§ 5 and 12(1) of the 1933 Act. Count III of the second amended complaint again alleges violation of § 12(2) of the 1933 Act, and § 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder and adds alleged violation of §§ 12(2) and 17(a) of the 1933 Act. The gravamen of this count is still that Firstar Milwaukee[8] failed to make full and fair disclosure of material information to Adventure Cattle investors, and adds further allegations that Firstar Milwaukee breached a fiduciary duty in failing to make those disclosures. Count IV is again a common-law claim of wrongful conversion or set-off, but with the responsible defendant identified as "Firstar Milwaukee," not merely as "Firstar." Finally, Count V is a newly amended common-law claim of fraud, this time identifying the responsible defendants as "Firstar

---

5. The court granted defendants leave to file such an overlength brief on July 12, 1995.

6. Although the court recognizes that the second amended complaint attempts to respond to deficiencies in the first amended complaint, particularly the court's requirement that matters such as fraud be pleaded with the particularity required by *Fed.R.Civ.P.* 9(b), the court nonetheless has some doubt that a complaint of seventy-five pages and one hundred thirty-six paragraphs meets *Fed.R.Civ.P.* 8(a)(2)'s requirement that the complaint contain a "short and plain statement of the claim." The court has no wish to encour-

age long and conclusory pleadings and believes that a happy medium between particularity and "short and plain statement" is possible without excessive length.

7. Count II of the first amended complaint alleged that "Firstar" committed these violations, without distinguishing among the defendants.

8. Again, this is a change from designation of the responsible defendant as "Firstar" in the first amended complaint.

Milwaukee" and "Firstar Wausau," not merely as "Firstar." The parties have directed their attention in the pending motions exclusively to the repleaded federal claims under RICO and securities laws, and the court's supplemental jurisdiction over the state common-law claims, of course, depends upon the viability of one or more of the federal claims. The court will therefore focus, as did the parties, on the repleaded federal claims.

### 1. Securities Allegations

The second amended complaint provides more extensive allegations concerning the operation of the Adventure Cattle program than did the first amended complaint. Because it is upon these allegations that the court's determination of whether or not the Adventure Cattle contracts were securities depends, if the court does indeed consider the second amended complaint, those allegations are presented here in full. For the sake of comparison, the allegations of ¶ 26 of the first amended complaint are presented side-by-side with the comparable allegations of ¶ 47 of the second amended complaint:

*TABLE I: Comparison Of Securities Allegations
In The First And Second Amended Complaints*

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
|---|---|
| 26. Morken's operation of the Adventure Cattle program worked as follows: | 47. The Adventure Cattle program worked as follows: |
| a. Morken would sell a specific group of cattle, to be located at a particular feed lot, to the purchaser.<br><br>[27. Each Purchaser entered into an agreement with Morken which, in form and substance, is substantially identical to Exhibit A, attached hereto and by this reference made a part hereof.] | a. Morken would purchase a "lot" of cattle from SGLE and would then resell that particular lot to an individual investor based on a promise that Morken would use his experience, skill, and market power over large numbers of cattle, to obtain a profit for the investor. Morken and the investor would enter into a Cattle Feeding Contract similar to that shown in Exhibit C. The cattle were to be located at feed lots in the Midwest selected by Morken (and, later, approved by Firstar Milwaukee) and fed at that location, under Morken's control, until Morken decided how, when, to whom, and for what price to sell the cattle. |
| b. The purchaser would invest $100 of his own funds for each head of cattle purchased, and would obtain a fully secured loan for the balance of the purchase price and for the expected feed costs from his own bank. These banks included Farm Credit Services of Southern Minnesota, Firstar Bank of Sioux City, First National Bank of Sioux Center, Iowa, Peoples Bank of Rock Valley, Iowa, American State Bank of Sioux Center, Iowa, Sioux County State Bank of Orange City, Iowa, and other financing organizations as shown on Exhibit B, "Bank List", attached hereto. Each Purchaser's financing organization would generally secure itself with a perfected UCC Article 9 security interest in the cattle purchased. The cattle would be kept at various feedlots located in Iowa, South Dakota, Nebraska and Kansas. | b. The investor would inject $100 of his own funds for each head of cattle covered in the contract, and would obtain a fully secured loan for the balance of the purchase price, and for the expected feed costs, through a conventional cattle loan from his own bank. These banks included Farm Credit Services of Southern Minnesota, Firstar Bank of Sioux City, First National Bank of Sioux Center, Iowa, Peoples Bank of Rock Valley, Iowa, American State Bank of Sioux Center, Iowa, Sioux County State Bank of Orange City, Iowa, as well as other financing organizations. |
| | c. Each investor would sign a promissory note obligating himself to his bank for the full amount of the cattle loan, and each inves- |

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
|---|---|
| | tor's bank secured itself with a perfected UCC Article 9 security interest in the cattle purchased by the investor. Proceeds advanced by those banks for their investor's purchase of cattle from Morken were paid to Morken and deposited to one of Morken's accounts at Firstar Milwaukee. |
| c. Feed and yardage expenses relative to the cattle would be charged by the feedlots directly to the purchaser, and the purchaser was responsible for payment of all feed and yardage expenses. | d. Feed and yardage expenses relative to the cattle would be charged by the various feedlots directly to the investor, and the investor was obligated for payment of all yardage expenses. |
| d. Morken monitored each group of cattle purchased and be guaranteed each investor a 25% annualized return (in effect, about $8.00 per head since the cattle were usually sold within three months) after sale of the cattle on the Purchaser's initial $100 per head investment. In return, Morken was entitled to any proceeds from the sale of the cattle in excess of the production cost plus the guaranteed return on the Purchaser's initial equity injection. Market losses on Adventure Cattle program cattle were assumed by Morken. | e. Morken contracted to 1.) maintain a minimum equity level of $50 in each lot of investor cattle, 2.) obtain market protection through the purchase of futures contracts to protect the calculated breakeven price, 3.) sell the cattle for the investors, and 4.) share in the profits realized after sale of the cattle, with the investors retaining the sale proceeds up to the calculated 25 percent return on equity with the balance of the sale proceeds being paid to Morken, or (in case the sale proceeds were not enough) by Morken paying the investors an amount in addition to the sale proceeds to bring the investors['] return on equity up to the calculated 25 percent. |
| [No comparable allegations.] | f. In operation, Morken sold the investor cattle for the investors through SGLE, because SGLE (and not Morken) was licensed as a cattle broker/dealer under the Packers and Stockyards Act, with authority to sell cattle on behalf of others. Packer sale proceeds were paid to SGLE who received the proceeds as a fiduciary for the investors, and who promptly remitted the proceeds directly to the investors after sale to the packer. |
| [No comparable allegations.] | g. Each investor in the Adventure Cattle program, and each of the banks which financed the investors, relied on Morken's experience, integrity and reputation in the cattle industry, his apparent and reputed ability to make money in any kind of cattle market, his expertise in feeding cattle, his skilled use of market protection ("put" options), and his marketing strategies to assure the continued viability and overall profitability of the Adventure Cattle program. Further, Morken's alleged substantial net worth, his diversification into related business activities such as trucking, and his ability to obtain favorable price concessions from meatpackers as a very large scale cattle seller with a degree of market power who was uniquely situated to meet the specific buying needs of the few very large scale meatpackers doing business in the Midwest (on terms more favorable than an individual could obtain by dealing separately with the meatpackers), was always cited to investors by Morken[,] by Firs- |

*TABLE I—Continued*

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
|---|---|
| | tar Milwaukee and Firstar Sioux City, and relied on by the investors as unique attributes of the Adventure Cattle program that would enable them to realize a profit on their participation in the program. |
| [No comparable allegations.] | h. Morken retained exclusive control over all marketing decisions relative to the investor cattle. In determining when, how, and to whom he would market these cattle, Morken often combined all or part of an individual investor's cattle with the cattle of other investors, and/or with his own cattle, depending on packer demand, to make marketable lots of sufficient numbers and quality of cattle for sale to packers. By combining and pooling investor cattle with other cattle owned or controlled by Morken, better prices could be realized in the sale of the cattle to the various meatpackers, thereby (theoretically) enabling Morken to maintain an overall level of profitability which, in combination with the market price protection (put options) Morken would acquire and place, and revenues from Morken's related ventures (e.g., SGLE handling fees, Jo Dor Trucking cha[r]ges, etc.) assured the investors that Morken would make enough money, in the long term, even in bad cattle markets, to perform the Cattle Feeding contracts. |
| [No comparable allegations.] | i. If Morken's overall operations did not generate sufficient profits or, conversely, if Morken's overall operations sustained losses in excess of what the investors understood to be his very substantial personal net worth, the value of the Cattle Feeding contracts to the investor, and the profits expected on their investment, would be worthless. Thus, from the standpoint of each investor, the returns to the investor were tied directly to, and were dependent upon, Morken's cattle marketing skills and the continued overall profitability of Morken's various cattle operations. In making the decision to invest in the program, each of the investors, including Plaintiffs, calculated that they were risking loss only if Morken became insolvent and, based on the information provided for them and for their banks by Firstar Milwaukee, that seemed a very remote possibility. |

The sample "Cattle Feeding Contract," appended to the second amended complaint as Exhibit C,[9] states that Morken would be "fully responsible for the care of the above described cattle" including responsibility for

health and nutrition programs, cost of inputs, death loss, and market protection (including breakeven point). Second Amended Complaint, Exhibit C. The contract provides further that "Morken will be fully responsible

9. This exhibit is identical to Exhibit A appended to the first amended complaint and previously

considered by the court.

for the marketing of the above described cattle." *Id.*

In the securities claims proper, the second amended complaint places new emphasis on the operation of the Adventure Cattle program. It provides new allegations about the extent to which Morken "pooled" investors' cattle,[10] the extent to which investors purportedly relied upon Morken's ability to make their investment profitable, and the extent to which the fortuity of the investment allegedly depended on the fortuity of Morken's fortunes.[11] New allegations also denigrate the extent to which individual investors had any decision-making authority with regard to the investment.[12]

### 2. RICO Allegations

The RICO allegations in the second amended complaint demonstrate an even more extensive revision as compared to the first amended complaint. The first amended complaint identified the RICO enterprise as "Morken's enterprises," and alleged "Firstar's" "control" of that enterprise. However, the second amended complaint instead identifies the RICO enterprise as "an association in fact" from approximately February of 1992 until June 2, 1994, of "Firstar Corporation,

10. Paragraph 110 of the second amended complaint alleges the following:

The Adventure Cattle program was a scheme in which Morken would pool the cattle owned by the various investors with cattle owned by Morken himself to make large marketable lots of uniform quality animals for favorable sale to various meatpackers. The individual investors had no part in the marketing decisions, and no knowledge of who owned the other animals that had been pooled with some or all of the [sic] their animals for sale to meatpackers. By pooling and combining the animals owned by multiple investors and by Morken himself, Morken generally was able to obtain better prices than would be realized by sale of smaller individual lots of cattle for an individual investor. Proceeds from the sale of the pooled animals were paid by the packers in a single check to SGLE, Morken's licensed marketing agent, whereupon Morken would cause a prorated distribution of packer proceeds to be made to individual investors based on the number of that investor's animals that had been contained in the pooled lot sold to the packer.

11. Paragraph 111 of the second amended complaint alleges the following:

In the Adventure Cattle program, if the skill and efforts of Morken in marketing the pooled cattle resulted in proceeds being realized in excess of the costs of production incurred by the investor, a profit would be realized. If the profits were less than the amount of the guarantee, Morken would pay the investor an amount required to bring the profit up to the level guaranteed. If the profits were more than what had been guaranteed, the investor would remit the difference back to Morken. The fortunes of the investors were thus directly tied to the efforts and to the overall fortunes of Morken, since Morken's ability to honor the Cattle Feeding Contracts in an unfavorable cattle market depended upon Morken's overall financial strength and resources (or his credit) and his touted ability (as the investors were led

to believe) to make money through handling charges, hedging, trucking, and other diversified endeavors even though the cattle market by itself might not always result in the generation of profits.

Paragraph 112 of the second amended complaint carries these allegations about the "fortuity" of the investment further:

Although concealed from the investors at the time that they made their investment decisions, (and, in fact, not revealed at any time except through discovery procedures in this case and in the related bankruptcy proceedings) in truth and in fact, the fortuity of the Plaintiffs' investments was entirely dependent on the credit Morken was given through the controlled disbursement scheme that Firstar Milwaukee had provided for Morken to finance the Adventure Cattle program through float, and on the willingness of Firstar Milwaukee to continue that secret line of "specialty credit". Accordingly, the fate of the investors was totally dependent on the fortunes of Morken in general, which (although unknown to them) included continuation of the float financing privileges that had been provided for Morken by Firstar Milwaukee through the controlled disbursement scheme.

12. Paragraph 113 of the second amended complaint alleges the following:

Other than deciding whether or not to participate in the program, the investors in the Adventure Cattle program, including Plaintiffs, made no decisions regarding their investment once the decision to participate was made. Each investor relied totally upon Morken to make their investment profitable. Morken made all decisions regarding Adventure Cattle program animals. Morken decided what kinds of cattle to buy and in what quantities and quality. He decided where the cattle were to be fed. He decided what market protection (options or futures contracts) to acquire relative to the cattle. He decided when, where, how and on what terms the cattle should be sold.

Firstar Milwaukee, Firstar Wausau, and Firstar Sioux City with John Morken and SGLE," which had as its alleged common purpose the penetration and expansion of the Firstar banks' presence in the agricultural lending markets of Minnesota and Iowa. Second Amended Complaint, ¶ 67. After June 2, 1994, when the strategy of market penetration was allegedly abandoned, the enterprise is alleged to have "continued but without the association of Morken and SGLE," with the common purpose of shifting the losses caused by that aborted strategy and by allegedly fraudulent schemes devised in pursuit of that strategy to the innocent victims of that strategy. Second Amended Complaint, ¶¶ 67–68.

The second amended complaint alleges that this enterprise was distinct from that inherent in a pattern of racketeering, because the association of Morken and Firstar Milwaukee allowed the Adventure Cattle scheme to operate through Firstar Milwaukee's operation of the controlled disbursement scheme, Second Amended Complaint, ¶ 69a; SGLE originated the purchase of all Morken controlled cattle and generated handling fees from the cattle allowing the enterprise to maintain the float, *Id.* at ¶ 69b; Firs-

tar Corporation subsidiary banks were encouraged to market "products" like the controlled disbursement scheme and Bankers' Acceptance financing scheme necessary to Morken's operations, *Id.* at ¶ 69c, d, & e; and Firstar Sioux City and Firstar Milwaukee worked to involve investors in the Adventure Cattle program while providing loans to Morken to operate the program. *Id.* at ¶ 69f. The second amended complaint also alleges a new claim of conspiracy to control this RICO enterprise by defendants Miley, Firstar Milwaukee, and Firstar Wausau, with new defendants Buscemi and Vinent. *Id.* at ¶¶ 70–71. The second amended complaint alleges that the pattern of racketeering and the RICO predicate acts of this RICO enterprise, *Id.* at ¶ 72, included the controlled disbursement scheme, *Id.* at ¶¶ 74–83; promotion of the Adventure Cattle program, *Id.* at ¶¶ 84–95; shut-down of the controlled disbursement scheme, *Id.* at ¶¶ 96–103; and bankruptcy fraud, *Id.* at ¶¶ 104–106.

The court believes that, once again, a side-by-side comparison of the comparable allegations of the first and second amended complaints will assist in understanding the differences between the two complaints.

*TABLE II: Comparison Of RICO Allegations*
*In The First And Second Amended Complaints*

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
| --- | --- |
| **Enterprise defined, conduct of enterprise** | |
| 43. From at least September 30, 1993, and through June 3, 1994, Firstar was associated with Morken's enterprise, and it participated directly and/or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Among other things, Firstar solicited and created the banking scheme which permitted Morken to operate his Adventure Cattle business as well as his other businesses. Additionally, Firstar helped promote the Adventure Cattle business and helped create a false picture of Morken's finances by soliciting investors in Adventure Cattle and by representing to investors and banks contemplating financing investors that Adventure Cattle and Morken were financially strong. Also, Firstar's agent, Mark Miley, worked directly with Morken in 1993 and 1994 to insure that Morken was able to keep the banking scheme operating knowing that | 67. From February to June 2, 1994, the RICO enterprise in this case consisted of an association in fact under 18 U.S.C. § 1961(4) of Firstar Corporation, Firstar Milwaukee, Firstar Wausau, and Firstar Sioux City with John Morken and SGLE. The Firstar banks associated with Morken as the means by which it hoped to penetrate and expand its presence in the agricultural lending markets of Minnesota and Iowa. After that strategy was abandoned, from June 2, 1994, to the present, the enterprise has continued but without the association of Morken and SGLE. This banking enterprise demonstrated (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering. |

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
|---|---|
| Morken's business ventures were in terrible financial trouble. Indeed, so pervasive was Firstar's involvement in the banking scheme it had created that it had the ability to decide who among Morken's investors and creditors would be paid. Finally, because the banking scheme created by Firstar was contrary to reasonable and prudent banking practices, Firstar could have terminated its relationship with Morken at any time. Had Firstar ended its banking scheme with Morken, no other lending institution who knew what Firstar knew would have agreed to lend Morken the money he needed in the manner he needed it to keep his ventures afloat. As a result of all these facts Firstar had substantial control over all of Morken's enterprises including Adventure Cattle. | |
| | 68. From February 1992 to June 2, 1994, the common or shared purpose of the enterprise was to penetrate the agricultural lending market, expand participation in that market, and to derive substantial and increasing fee income through a direct association with Morken and SGLE. Since June 2, 1994, when it became apparent to the Firstar banks that its strategy was not working, the common or shared purpose of the enterprise has been to shift the losses caused by that aborted strategy and by the fraudulent schemes devised in pursuit of that strategy (that had been perpetrated from February 1992 through June 2, 1994) to the innocent victims of those schemes. |
| [No comparable allegations.] | 69. That the enterprise demonstrated continuity of structure and personnel, and that the structure of the enterprise was distinct from that inherent in a pattern of racketeering, is shown above and as follows: [because the association of Morken and Firstar Milwaukee allowed the Adventure Cattle scheme to operate through Firstar Milwaukee's operation of the controlled disbursement scheme, Second Amended Complaint, ¶ 69a; SGLE originated the purchase of all Morken controlled cattle and generated handling fees from the cattle allowing the enterprise to maintain the float, *Id.* at ¶ 69b; Firstar Corporation subsidiary banks were encouraged to market "products" like the controlled disbursement scheme and Bankers' Acceptance financing scheme necessary to Morken's operations, *Id.* at ¶ 69c, d, & e; and Firstar Sioux City and Firstar Milwaukee worked to involve investors in the Adventure Cattle program while providing loans to Morken to operate the program.] |
| **Control of the RICO enterprise** | |
| [See paragraph 43 above: control of the banking scheme by Firstar was alleged to be | 70. From February 1992 to June 2, 1994, Defendants Mark Miley, Alfonso Buscemi, |

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
|---|---|
| control of the enterprise.] | Roberto Vinent, Firstar Milwaukee, and Firstar Wausau directly managed and controlled the banking enterprise described above in ¶¶ 67–69, through a pattern of racketeering, in violation of 18 U.S.C. §§ 1962(c), and have conspired to do so in violation of 18 U.S.C. § 1962(d).<br>71. Since June 2, 1994, after it had become apparent that Firstar's strategic plans had failed, Defendants Miley, Buscemi and Vinent were removed from their positions of management and control, and Defendants Firstar Milwaukee and Firstar Corp., through various officers, directors, attorneys and employees, including (but not limited to) Jack Goodnow, Bill Schultz, John Becker, and Roger Fitzsimonds, took over the operation, management and control of the banking enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), and in execution of a continuing conspiracy to do so that was begun in April of 1994, in violation of 18 U.S.C. § 1962(d). |

**Pattern or racketeering**

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
|---|---|
| 44. The pattern of racketeering activity consisted of the following:<br> a. [Check kiting through the mails, aided and abetted by Firstar, constituting mail and wire fraud in violation of 18 U.S.C. § 1341 & 1343.]<br> b. [Securities fraud in Firstar's participation in the controlled disbursement scheme while concealing from investors Morken's true financial condition.]<br> c. [Fraud by deceit in deciding to collapse the "float," but continuing to fund Morken's accounts to minimize Firstar's losses at the expense of innocent persons.] | |
| d. [Bankruptcy fraud in asserting in the bankruptcy proceedings that Firstar had only just become aware that it was a "victim" of the check kiting when it had always known about Morken's banking practices.] | 72. The acts of racketeering by which Defendants Miley, Buscemi, Vinent, Firstar Milwaukee and Firstar Wausau operated, managed and controlled the banking enterprise prior to June 2, 1994, include multiple and related acts of mail fraud, wire fraud, and fraud in connection with the sale of securities, all defined as acts of racketeering in 18 U.S.C. § 1961. As hereinabove described, from mid 1992 through June 2, 1994, there were two related fraudulent schemes in operations simultaneously: 1.) controlled disbursement scheme and 2.) the scheme to expand the Adventure Cattle program. From at least June 2, 1994, and probably since mid April, 1994, a third related fraudulent scheme and conspiracy to commit such a fraudulent scheme (i.e., the shut down/bankruptcy strategy) was commenced in which the operation and control of the banking enterprise was shifted to Jack Goodnow and other employees in the Firstar Milwaukee |

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
|---|---|
| | Special Loans Group, to Bill Schulz [sic] and others employed in Firstar Corporation's in-house legal department, and to other officers of Firstar Corporation and Firstar Milwaukee not presently known to Plaintiffs. Since that time, Firstar Milwaukee and Firstar Corporation have carried out this third scheme and the scheme is still in operation. The first two schemes were pursued by Defendants Firstar Milwaukee, Firstar Wausau, Miley, Buscemi, and Vinent as part of a strategic plan to penetrate and establish additional market share in the agricultural lending markets, to expand fees, and to shift credit risk to innocent investors and creditors while Morken and SGLE were still associated with the banking enterprise. The third scheme [was] pursued by Defendants Firstar Milwaukee and Firstar Corporation and began when a decision was made (sometime between March 1 and June 2, 1994, the exact date being known only by the Defendants) to abandon the st[r]ategy that had been pursued for two years, and that third scheme and conspiracy was pursued (and is still being pursued) by Firstar Corporation and Firstar Milwaukee in an effort to minimize the consequences of the aborted strategy and the first two schemes devised in pursuit thereof, and to impose the consequences of these schemes on the innocent victims thereof. |

**Predicate acts**

| FIRST AMENDED COMPLAINT | SECOND AMENDED COMPLAINT |
|---|---|
| [As alleged in paragraph 44(a)–(d):] | 73. The predicate acts of racketeering activity include all acts done by the Defendants identified in ¶¶ 70–72 above, in furtherance of the multiple schemes described above, virtually all of which depended on and were carried out through the use of interstate mails, phone lines, and wire facilities, and which are more particularly described as follows: |
| [a. Mail and wire fraud in check kiting.] | (a.) The Controlled Disbursement Scheme [¶¶ 74–83] |
| [b. Securities fraud.] | (b.) Promotion of the Adventure Cattle Program [¶¶ 84–95] |
| [c. Fraud in collapse of the "float."] | (c.) The Shut-down of the Controlled Disbursement Scheme [¶¶ 96–103] |
| [d. Bankruptcy fraud.] | (d.) The Bankruptcy [¶¶ 104–106] |

With this background in mind, the court turns to the legal analysis of the motions now pending before the court.

## II. LEGAL ANALYSIS

### A. The Motion For Reconsideration

Although the defendants' criticism of the vagueness of plaintiffs' motion to reconsider is well-taken, it is nonetheless apparent that the motion seeks two things. First, it seeks amendment of the court's March 1, 1995, ruling to allow plaintiffs the opportunity to file an amended complaint, because plaintiffs believe that the deficiencies the court found in the first amended complaint could be cured, and the court should have granted leave to amend as a matter of course. Sec-

ond, it seeks alteration or amendment of the ruling, because plaintiffs assert that the court improperly rejected unidentified precedent of the Eighth Circuit Court of Appeals in determining that the Adventure Cattle contracts are not securities within the meaning of the Securities Acts of 1933 and 1934.[13] The court's analysis begins with the standards applicable to, and, indeed, with the identification of the authority for, the plaintiffs' motion to reconsider.

### 1. Applicable standards

Plaintiffs' motion fails to identify the authority for a motion to reconsider. The Eighth Circuit Court of Appeals commented on the "dangers of filing a self-styled 'motion for reconsideration' that is not described by any particular rule of federal civil procedure," and identified the usual bases upon which such motions are construed to have been made, in *Sanders v. Clemco Indus.*, 862 F.2d 161 (8th Cir.1988):

Federal courts have construed this type of motion as arising under either Rule 59(e) (motion to alter or amend the judgment) or Rule 60(b) (relief from judgment for mistake or other reason). *See Spinar v. South Dakota Bd. of Regents*, 796 F.2d 1060, 1062 (8th Cir.1986). The two rules serve different purposes and produce different consequences, both substantive and procedural. *See A.D. Weiss Lithograph Co. v. Illinois Adhesive Prods. Co.*, 705 F.2d 249, 249–50 (7th Cir.1983) (per curiam). When the moving party fails to specify the rule under which it makes a postjudgment motion, that party leaves the characterization of the motion to the court's somewhat unenlightened guess, subject to the hazards of the unsuccessful moving party losing the opportunity to

present the merits underlying the motion to an appellate court because of delay.

*Sanders*, 862 F.2d at 168 (footnotes omitted). Plaintiffs' failure to identify the authority for their motion to reconsider has left them with precisely the dangers identified by the court in *Sanders*.

The court's "somewhat unenlightened guess" here is that the motion, filed within ten days after the judgment, was intended to be made pursuant to *Fed.R.Civ.P.* 59(e); *Sanders*, 862 F.2d at 168–69 (distinguishing between of a motion filed within ten days of the judgment, deemed to be made pursuant to Rule 59(e), and one made later, deemed to be made pursuant to Rule 60(b)). Plaintiffs have done nothing to discount defendants' construction of the motion as having been made pursuant to that rule, and, indeed, referred to the motion in oral argument as having been made pursuant to *Fed.R.Civ.P.* 59(e).[14] Although the court will first consider the standards for a motion made pursuant to Rule 59(e) first, as the most likely authority upon which plaintiffs' motion to reconsider is based, the court will also consider the standards applicable to a motion made pursuant to Rule 60(b).

### a. Rule 59(e) motion to alter or amend

■ Federal Rule of Civil Procedure 59(e) provides as follows:

(e) **Motion to Alter or Amend a Judgment.** A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.

*Fed.R.Civ.P.* 59(e). Thus, *Fed.R.Civ.P.* 59(e) empowers a district court to alter or amend original judgments. *Fed.R.Civ.P.* 59(e). "Although the words 'alter or amend' imply something less than 'set aside,' a court may use Rule 59(e) to set aside the entire judg-

---

13. At oral arguments, counsel for plaintiffs characterized the relief sought by the motion in similar terms as not having "ask[ed] for much," just reconsideration of the securities issue and the opportunity to replead the RICO claims.

14. Although plaintiffs' motion also suggests that the court made factual errors, the court does not believe a motion pursuant to *Fed.R.Civ.P.* 52(b) to be a viable alternative, although motions pursuant to both rules are often made jointly, and

Rule 52(b) specifically provides for amendment of findings of fact. In the ruling plaintiffs ask this court to reconsider, which granted defendants' motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b)(6), the court made no findings of fact. Rather, the court treated as true the facts pleaded in the first amended complaint. *See, e.g., Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Carney v. Houston*, 33 F.3d 893, 894 (8th Cir.1994).

ment." *Sanders v. Clemco Indus.*, 862 F.2d 161, 168 n. 13 (8th Cir.1988) (citing *A.D. Weiss Lithograph Co. v. Illinois Adhesive Prods. Co.*, 705 F.2d 249, 250 (7th Cir.1983); C. Wright & A. Miller, *Federal Practice and Procedure* § 2817, at 111 n. 31 (1973)).

■ Although the rule identifies the time within which such a motion must be filed,[15] it does not otherwise establish the criteria by which the court is to assess the merits of the motion. However, the Eighth Circuit Court of Appeals quoted with approval the Seventh Circuit Court of Appeals' statement that the " 'limited function' " of a motion for reconsideration is " 'to correct manifest errors of law or fact or to present newly discovered evidence.' " *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir.) (quoting *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir.), *as amended*, 835 F.2d 710 (7th Cir.1987), quoting in turn *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1983), *aff'd*, 736 F.2d 388 (7th Cir.1984)), *cert. denied*, 488 U.S. 820, 109 S.Ct. 63, 102 L.Ed.2d 40 (1988); *see also Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1523 (10th Cir. 1992) (purpose of a motion to alter or amend a judgment under Rule 59(e) "is to correct manifest errors of law or to present newly discovered evidence."). Therefore, a party moving to alter or amend a judgment pursuant to Rule 59(e) " 'must clearly establish either a manifest error of law or fact or must present newly discovered evidence.' " *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (quoting *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268).

■ The Eighth Circuit Court of Appeals has held that " '[a] motion to alter or amend judgment cannot be used to raise arguments which could have been raised prior to the issuance of judgment.' " *Concordia College Corp. v. W.R. Grace & Co.*, 999 F.2d 326, 330 (8th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 926, 127 L.Ed.2d 218 (1994) (quot-

ing *Hagerman*, 839 F.2d at 414); *Hagerman*, 839 F.2d at 413–14 (citing *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986)); *Ray E. Friedman & Co. v. Jenkins*, 824 F.2d 657, 660 (8th Cir.1987); *see also LB Credit Corp.*, 49 F.3d at 1267 ("A motion to alter or amend a judgment is not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment or to present evidence that was available earlier"; citations omitted); *Anderson v. Flexel, Inc.*, 47 F.3d 243, 247–48 (7th Cir.1995); *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.1991), *cert. denied*, 506 U.S. 828, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992); *Fontenot v. Mesa Petroleum*, 791 F.2d 1207, 1219 (5th Cir.1986). Furthermore, the party making the motion cannot "use a Rule 59(e) motion 'to introduce new evidence that could have been adduced during pendency of the [dispositive] motion. . . . Nor should a motion for reconsideration serve as the occasion to tender new legal theories for the first time.' " *Id.* (quoting *Hagerman*, 839 F.2d at 414); *Dale & Selby Superette & Deli v. United States Department of Agric.*, 838 F.Supp. 1346, 1348 (D.Minn.1993) ("[A] motion made pursuant to Rules 52 and 59 is not intended to routinely give litigants a second bite at the apple, but to afford an opportunity for relief in extraordinary circumstances.").

■ The trial court's grant or denial of a motion pursuant to *Fed.R.Civ.P.* 59(e) is reviewed on the grounds of abuse of discretion. *Concordia College Corp.*, 999 F.2d at 330; *Twin City Constr. Co. of Fargo v. Turtle Mountain Band of Chippewa Indians Through LaFromboise*, 911 F.2d 137, 139 (8th Cir.1990); *Hagerman*, 839 F.2d at 413; *Roudybush v. Zabel*, 813 F.2d 173, 178 (8th Cir.1987); *Harris v. Arkansas Dep't of Human Servs., Div. of Mental Retardation–Developmental Disabilities Servs.*, 771 F.2d 414, 416–17 (8th Cir.1985). Therefore, a court's decision upon reconsideration pursu-

15. Rule 59(e) motion must be filed "not later than 10 days after the entry of the judgment." *Fed.R.Civ.P.* 59(e). A party's failure to file a timely Rule 59(e) motion eliminates that rule as the basis for the district court's action. *See Spangle v. Ming Tah Elec. Co.*, 866 F.2d 1002, 1003 (8th Cir.1989); *Sanders v. Clemco Indus.*, 862 F.2d 161, 168 (8th Cir.1988); *Townsend v. Terminal Packaging Co.*, 853 F.2d 623, 624 (8th Cir.1988). As the court observed in the body of the text, plaintiffs filed their motion within the ten day time period as required for a Rule 59(e) motion.

ant to Rule 59(e) will not be reversed unless there is a clear showing of abuse of discretion. *See Concordia College Corp.,* 999 F.2d at 330; *Harris,* 771 F.2d at 417.

### b. *Rule 60(b) motion for relief from judgment*

Plaintiffs' failure to identify the authority for their motion to reconsider, even though it was filed within ten days of the ruling it seeks to have reconsidered and may therefore be presumed to be made pursuant to Rule 59(e), could also reasonably be construed as a motion for relief from judgment made pursuant to *Fed.R.Civ.P.* 60(b). The court will therefore examine the standards applicable to a Rule 60(b) "motion to reconsider" as well. *Fed.R.Civ.P.* 60(b) provides, in pertinent part, that

> [o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

Thus, a motion pursuant to Rule 60(b) does not suffer from the same time restrictions as are found in Rule 59(e), *Robinson v. Armontrout,* 8 F.3d 6, 7 (8th Cir.1993) ("The rule requires that the motion be made within a reasonable time and, if based on grounds (1), (2), or (3), no more than one year after judgment."). However, because plaintiffs'

motion was timely under Rule 59(e), it must necessarily be timely under Rule 60(b).

■ The Eighth Circuit Court of Appeals has consistently held that a motion pursuant to Rule 60(b) requires that the moving party establish "exceptional circumstances" to obtain the "extraordinary relief" the rule provides. *United States v. One Parcel of Property Located at Tracts 10 and 11 of Lakeview Heights, Canyon Lake, Comal County, Texas,* 51 F.3d 117, 119 (8th Cir.1995) (hereinafter, *"One Parcel"*) ("A district court should grant a Rule 60(b) motion 'only upon an adequate showing of exceptional circumstances,'" quoting *United States v. Young,* 806 F.2d 805, 806 (8th Cir.1986), *cert. denied,* 484 U.S. 836, 108 S.Ct. 117, 98 L.Ed.2d 76 (1987)); *Mitchell v. Shalala,* 48 F.3d 1039, (8th Cir.1995) ("Generally, Rule 60(b) provides for extraordinary relief, which may be granted only upon a showing of exceptional circumstances."); *Atkinson v. Prudential Property Co., Inc.,* 43 F.3d 367 (8th Cir.1994) (also quoting *Young*); *Schultz v. Commerce First Financial,* 24 F.3d 1023, 1024 (8th Cir. 1994) (also quoting *Young*); *Robinson,* 8 F.3d at 6 (8th Cir.1993) (also quoting *Young*); *Reyher v. Champion Int'l Corp.,* 975 F.2d 483, 488 (8th Cir.1992) (Rule 60(b) provides for extraordinary relief which may be granted only on adequate showing of exceptional circumstances). This standard of requiring "exceptional circumstances" in order to provide relief applies even to motions brought on the "catch-all" ground found in Rule 60(b)(6), which provides for relief "for any other reason" found by the court to provide sufficient justification. *Atkinson,* 43 F.3d at 373; *Schultz,* 24 F.3d at 1024; *In re Zimmerman,* 869 F.2d 1126, 1128 (8th Cir. 1989). The provisions of Rule 60(b) "do 'not give courts unlimited authority to fashion relief as they deem appropriate.'" *Schultz,* 24 F.3d at 1024 (quoting *In re Zimmerman,* 869 F.2d 1126, 1128 (8th Cir.1989)).

■ Because plaintiffs have cited no authority for their motion for reconsideration, the court must first attempt to discern the basis for that motion from the arguments plaintiffs make in their motion. *Robinson,* 8 F.3d at 7 (movant did not detail which of Rule 60(b)'s ground he was relying upon, so

the court looked to nature of his allegations to determine the basis for his motion); *Sanders,* 862 F.2d at 168 (court must make "unenlightened" determination of basis for motion from allegations and circumstances). Plaintiffs assert that copious discovery has occurred since the filing of the first amended complaint, and that the products of this discovery have allowed them to replead their complaint with greater particularity. However, the products of this discovery cannot be considered "newly discovered evidence" to bring plaintiffs' motion within *Fed.R.Civ.P.* 60(b)(2), because plaintiffs' own supporting affidavits demonstrate that the evidence was available prior to dismissal of the first amended complaint and could have provided the basis for amendments prior to dismissal.[16] Four of the remaining five grounds for a Rule 60(b) motion, reasons (1), (3), (4), and (5), are all plainly inapplicable.[17] Thus, the court concludes that if plaintiffs are entitled to any relief under Rule 60(b), it must be pursuant to the "catch-all" ground found in subsection 6, which provides for relief for "any other reason justifying relief from the operation of the judgment." *Fed.R.Civ.P.* 60(b)(6).

Rule 60(b)(6) was intended to provide relief "only where 'exceptional circumstances prevented the moving party from seeking redress through the usual channels.'" *Atkinson,* 43 F.3d at 373 (quoting *In re Zimmerman,* 869 F.2d at 1128). As the Eighth Circuit Court of Appeals observed,

> "[e]xceptional circumstances" are not present every time a party is subjected to potentially unfavorable consequences as a

result of an adverse judgment properly arrived at. Rather, exceptional circumstances are relevant only where they bar adequate redress. As noted above, Atkinson had a full and fair opportunity to litigate his claim. The district court properly found that he [was not entitled to relief]. Accordingly, Atkinson is not entitled to relief under Fed.R.Civ.P. 60(b)(6).

*Atkinson,* 43 F.3d at 373–74. Thus, the "any other reason" ground has been significantly restricted by applicable case law.

Whether to grant a hearing or make specific findings in ruling upon a Rule 60(b) motion is left to the district court's discretion. *Atkinson,* 43 F.3d at 374; *Schultz,* 24 F.3d at 1025 (no argument or hearing necessary if court was in possession of all facts relevant to the issue upon which reconsideration is sought); *Baxter Int'l,* 11 F.3d at 93 n. 4. Nonetheless, the court found that the complexity of the arguments, law, and factual allegations pertinent to this matter necessitated such a hearing.

■ Just as whether or not a hearing should be had is left to the court's discretion, the ultimate grant or denial of a Rule 60(b) motion also rests in the discretion of the district court. *Sheng v. Starkey Labs., Inc.,* 53 F.3d 192, 194 (8th Cir.1995); *One Parcel,* 51 F.3d at 119; *Mitchell,* 48 F.3d at 1041; *Tungseth v. Mutual of Omaha Ins. Co.,* 43 F.3d 406, 409 (8th Cir.1994); *Atkinson,* 43 F.3d at 371 (describing the district court's discretion as "wide," citing *Baxter Int'l, Inc.,* 11 F.3d at 92, and therefore requiring "clear abuse of discretion" for reversal); *Schultz,* 24

---

**16.** Motions pursuant to Rule 60(b)(2), asserting newly discovered evidence, are, in any event, viewed with disfavor. *Mitchell,* 48 F.3d at 1041 (citing *Dabney v. Montgomery Ward & Co.,* 692 F.2d 49, 52 (8th Cir.1982), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983)). A person moving for relief pursuant to Rule 60(b)(2) must establish the following: (1) the evidence was discovered after trial; (2) due diligence was exercised to discover the evidence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence is such that a new trial would probably produce a different result. *Mitchell,* 48 F.3d at 1041; *Atkinson,* 43 F.3d at 371; *Baxter Int'l, Inc. v. Morris,* 11 F.3d 90 (8th Cir.1993). These requirements plaintiffs manifestly cannot meet here.

**17.** Because plaintiffs' complaint alleges causes of action for fraud, the "fraud" ground of Rule 60(b)(3) must be distinguished from the plaintiffs' fraud cause of action. To prevail on a motion under Rule 60(b)(3), "the movant must show, with clear and convincing evidence, that the opposing party engaged in a fraud or misrepresentation *that prevented the movant from fully and fairly presenting its case.*" *Atkinson,* 43 F.3d at 367 (citing *Paige v. Sandbulte,* 917 F.2d 1108, 1109 (8th Cir.1990)) (emphasis added). The fraud plaintiffs allege is the basis for their cause of action; plaintiffs do not allege that any fraud prevented them from fully or fairly presenting the action here prior to dismissal of the complaint pursuant to Rule 12(b)(6).

F.3d at 1024; *Baxter Int'l, Inc.*, 11 F.3d at 92; *Sanders*, 862 F.2d at 169. With these standards for reconsideration in mind, the court turns to consideration of plaintiffs' motion.

### 2. Reconsideration here

As the court observed above, the motion for reconsideration, now deemed, in the first instance, at least, to have been made pursuant to *Fed.R.Civ.P.* 59(e), asks for two things. It seeks reconsideration of the court's ruling that the contracts in question are not securities and the opportunity to replead the RICO claims. The court therefore begins its analysis of plaintiffs' motion for reconsideration with consideration of the question of whether it committed a "manifest error of law," *Hagerman*, 839 F.2d at 414; *Committee for the First Amendment*, 962 F.2d at 1523, as plaintiffs assert, by improperly departing from controlling precedent of the Eighth Circuit Court of Appeals in ruling on the securities law issue. The court will then consider whether some "exceptional circumstances" require the court to relieve plaintiffs, pursuant to Rule 60(b)(6), of the determination that the securities claims must be dismissed for failure to state a claim upon which relief can be granted. *Atkinson*, 43 F.3d at 373; *Schultz*, 24 F.3d at 1024; *In re Zimmerman*, 869 F.2d at 1128.

After completing this dual analysis of the securities issue, the court will perform the same analysis two-part consideration, pursuant to both Rule 59(e) and Rule 60(b), of the question of whether it should have granted the plaintiffs leave to amend as a matter of course, rather than dismissing the first amended complaint outright. Woven into this analysis of the second issue presented in the "motion for reconsideration" must be due consideration for plaintiffs' alternative motion for leave to file a second amended complaint, which presents significantly different allegations in support of both the securities law and RICO claims.

### a. Reconsideration in light of controlling precedent

■ Although plaintiffs' motion, rather surprisingly, does not identify the controlling precedent on the securities issue this court purportedly disregarded, plaintiffs eventually identified that precedent in their reply brief as *Booth v. Peavey Co. Commodity Servs.*, 430 F.2d 132 (8th Cir.1970), which plaintiffs characterize as holding that only vertical commonality, not horizontal commonality, is a requirement of a "security." Plaintiffs also rely on *Christensen Hatch Farms, Inc. v. Peavey Co.*, 505 F.Supp. 903, 907 (D.Minn. 1981), as recognizing that *Booth* required only vertical commonality and that the district court was powerless to depart from that authority until and unless *Booth* was overruled. The court, however, finds no "manifest error of law" or "exceptional circumstances" requiring modification of its March 1, 1995, ruling, because it concludes that plaintiffs have mischaracterized both *Booth* and this court's decision on the "commonality" issue.

### i. The disregarded precedent.

The relevant portion of *Booth*, in its entirety, states as follows:

> While the point was not argued by the parties, we feel it necessary to consider first whether an investor has a right to institute an action against a dealer for churning a commodity account. Such an action is not specifically provided for by the Commodity Exchange Act, 7 U.S.C. §§ 1–17. We believe, however, that a private remedy for churning a commodity account is permitted by either § 6(d) of the Commodity Exchange Act, *Goodman v. H. Hentz & Co.*, 265 F.Supp. 440 (N.D.Ill. 1967), or the applicable portions of the Securities Act of 1933, 15 U.S.C. §§ 77a, *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, *et seq.*, *Maheu v. Reynolds & Co.*, 282 F.Supp. 423, 429, n. 2 (S.D.N.Y.1968); *W.J. Abbott & Co. v. S.E.C.*, 276 F.Supp. 502 (W.D.Pa.1967). *See also, Anderson v. Francis I. duPont & Co.*, 291 F.Supp. 705 (D.Minn.1968); *Berman v. Orimex Trading, Inc.*, 291 F.Supp. 701 (S.D.N.Y.1968).

*Booth*, 430 F.2d at 133. In *Christensen Hatch Farms*, the United States District Court for the District of Minnesota read *Booth* to mean that, "[b]y implication, the court found that the commodity futures ac-

count constituted a security for purposes of the 1934 Act," and that somehow that finding resolved the question of whether vertical or horizontal commonality was required under the *Howey* test of what is a security, the suggestion being that the commodity futures account lacked horizontal commonality. *Christensen Hatch Farms*, 505 F.Supp. at 906–907. There are several responses to this argument.

***ii. Import of the precedent.*** First, *Booth* on its face says nothing explicitly about whether horizontal or vertical commonality is required for an investment vehicle to be a security. What it addresses is whether a cause of action exists against a dealer for churning a commodity account. *Booth*, 430 F.2d at 133. The Eighth Circuit Court of Appeals found that such a cause of action was authorized in either of two places. *Id.* First, the court cited "§ 6(d) of the Commodity Exchange Act," relying on the authority of *Goodman*. *Id.* However, the district court's decision in *Goodman* did not rely on "§ 6(d)" of the Commodity Exchange Act. Rather, that decision relies on "Section 6b of the Commodities Exchange Act," which the decision characterizes as making it " 'unlawful' for an employee of a member of a contract commodity market to cheat or defraud or attempt to cheat or defraud an investor dealing in commodity contracts or commodity futures contracts, in interstate commerce." *Goodman*, 265 F.Supp. at 447. Thus, under *Goodman*, the authority for the cause of action depends upon the investor being cheated while dealing in commodity contracts, which has nothing to do with whether or not the commodity contracts or the commodity account at issue in *Booth* was a "security," let alone a security despite lack of horizontal commonality.

Next, the court has reviewed the history of § 6 of the Commodity Exchange Act and finds that it did not in 1970 include a subsection (d) as identified in *Booth*, 430 F.2d at 133. Rather, 7 U.S.C. § 6 included only three subsections prior to amendment in January 1983 by Pub.L. 97–444, Title II, § 204, 96 Stat. 2299, and further amendment in October of 1992 by Pub.L. 102–546, Title V, § 502(a), 106 Stat. 3629. Assuming that the *Booth* court might have been referring to § 6

of the Act itself, rather than to the codified section, the court has examined 7 U.S.C. § 9a, which was the codification of § 6(d) of the Commodity Exchange Act as of 1970. That section provides for the determination of the amount of money penalties assessed under codified § 9, and therefore does not appear pertinent. However, codified § 6d, as it stood in 1970, does appear to be relevant to the *Booth* decision, because it provides, *inter alia*, that a person "engage[d] as [a] futures commission merchant" must treat the "money, securities, and property" of investors "as belonging to such customers." 7 U.S.C. § 6d(2) (1968). This section has some applicability to the question in *Booth* as well, but does not require a conclusion that horizontal commonality is not required for a security. Under this provision, the obligation to treat "money, securities, and property" of investors "as belonging to such customers," arises because of the handling of another person's property, not because the other person's account is necessarily a "security," let alone necessarily a "security" without horizontal commonality. The obligation would be the same whether the account was an individual account or a "pooled" account of several investors.

Turning to the second basis for the cause of action identified in *Booth*, which is the Securities Acts of 1933 and 1934, albeit without any identification of which particular provisions might be applicable, the court has again turned to the decisions cited by the Eighth Circuit Court of Appeals for elucidation. First, the Eighth Circuit Court of Appeals cites *Maheu v. Reynolds & Co.*, 282 F.Supp. 423, 429, n. 2 (S.D.N.Y.1968). In *Maheu*, the court considered whether a joint commodities futures account managed and supervised in all respects by the defendant on behalf of the several investors constituted a "security" within the meaning of the Securities Acts. *Id.* at 429. The district court held that "no pooling arrangement or common enterprise among investors" was required if there was "reliance on the efforts of another." *Id.* The point of significance for the Eighth Circuit Court of Appeals in *Booth*, it appears to this court, was not this holding of *Maheu*, a point with which count-

less other decisions applying the Howey test would disagree,[18] but the point that a cause of action was available under the Securities Acts in *Maheu* against a dealer who improperly handled the commodities accounts of clients. *Booth*, 430 F.2d at 133, *and compare Maheu*, 282 F.Supp. at 429 (suit against dealer involved issues under the Securities Acts of 1933 and 1934, and therefore the court could not order arbitration).

Nor do the other cases cited in *Booth* create the necessary implication that horizontal commonality has not been required by this circuit since 1970, as plaintiffs assert. *See W.J. Abbott & Co. v. S.E.C.*, 276 F.Supp. 502 (W.D.Pa.1967) (holding that the S.E.C. may subpoena records in a securities investigation even if the persons involved are also subject to regulation by the Department of Agriculture under the Commodity Exchange Act); *Anderson v. Francis I. duPont & Co.*, 291 F.Supp. 705 (D.Minn.1968) (pooling of investments in commodities could be security and dealer operating the pool could be found to have violated securities laws); *Berman v.*

*Orimex Trading, Inc.*, 291 F.Supp. 701 (S.D.N.Y.1968) (agreeing with *Maheu* that dealer's agreement to handle investment in commodities could be security even if underlying commodities were not securities). Thus, this court does not believe that it committed any "manifest error of law" in disregarding plaintiff's strained reading of *Booth*. *Hagerman*, 839 F.2d at 414; *Committee for the First Amendment*, 962 F.2d at 1523.[19] In the absence of such an error of law, the court also concludes that there are no "exceptional circumstances" requiring the court to modify its decision pursuant to Rule 60(b), not least because, if plaintiffs disagreed with the court's determination, they could have sought redress by way of appeal. *Atkinson*, 43 F.3d at 373; *Schultz*, 24 F.3d at 1024; *In re Zimmerman*, 869 F.2d at 1128.

***iii. Irrelevance of the precedent to this court's ultimate determination.*** Even if *Booth* could be construed to mean what plaintiffs say it means, that construction of Eighth Circuit law would not mean that this court committed a manifest error of law in

---

**18.** This court has found no other authority holding that an investment may constitute a security even though the "common enterprise" requirement of the *Howey* test has not been met. Indeed, two of the authorities cited in *Maheu* for the proposition that an investment vehicle may constitute a security even if there is no pooling arrangement or common enterprise antedate *Howey*. *See Maheu*, 282 F.Supp. at 429 (citing *Securities and Exchange Comm'n v. Payne*, 35 F.Supp. 873 (S.D.N.Y.1940); *Securities & Exchange Comm'n v. Wickham*, 12 F.Supp. 245 (D.Minn.1935)). The third authority cited in *Maheu*, 1 Loss, *Securities Regulation* 489 (2d ed. 1961), does not support the proposition, because a statement that "the line (between what is a security and what is not) is drawn ... where neither the element of a common enterprise nor the element of reliance on the efforts of another is present," suggests that both elements are required. The *Maheu* court's reading of *Howey* as supporting the proposition that a security requires either a common enterprise or reliance on the efforts of another, but not both, is untenable. *Maheu*, 282 F.Supp. at 429. *Maheu* seems to suggest that because the Supreme Court in *Howey* reversed the decision of the Fifth Circuit Court of Appeals, which had found that there was no common enterprise, and therefore no security, the Supreme Court somehow indicated that a common enterprise was not required if the investor relied on the efforts of another. *Id.* However, the Supreme Court in *Howey* did not find that there was a "security" even though there was no common enterprise. Rather, the Supreme

Court, contrary to the conclusions of the Fifth Circuit Court of Appeals, found that there was indeed a common enterprise. *Howey*, 328 U.S. at 299–301, 66 S.Ct. at 1103–04.

**19.** In its March 1, 1995, ruling, this court acknowledged that the Seventh Circuit Court of Appeals had identified another Eighth Circuit Court of Appeals decision as requiring only vertical commonality. *See DeWit*, 879 F.Supp. at 978 (citing *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1017–18 (7th Cir.1994), as identifying the split in the circuits over whether "vertical" or "horizontal" commonality is required for an "investment contract" under *Howey*, and further identifying *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414, 418 (8th Cir.1974), as holding that only vertical commonality is required). However, this court must respectfully suggest that the case relied upon by the Seventh Circuit Court of Appeals as stating this position of the Eighth Circuit Court of Appeals does no such thing. Instead, *Miller* discusses at some length the requirement that the investor rely on the efforts of the promoter, the third prong of the *Howey* test, in deciding whether or not the contracts in question were securities. *Miller*, 494 F.2d at 417–18. Nowhere does *Miller* discuss the presence or absence of a common enterprise; the issue before the court was instead the presence or absence of the third factor of the *Howey* test only.

ruling that the Adventure Cattle contracts were not securities. The court did not rely exclusively on its conclusion that the contracts lacked horizontal commonality in ruling that the contracts were not securities. *DeWit,* 879 F.Supp. at 978–80. The court first examined the meaning of both horizontal and vertical commonality, and attempted to identify any trend in recent decisions towards requiring one or the other form of commonality, because the court found that the Eighth Circuit Court of Appeals had long been silent on the question. *Id.* The court did, as plaintiffs say, conclude that "the weight and better reasoned of the more recent decisions, and the purpose of the securities acts to provide uniform disclosure, show that horizontal commonality is an essential element of the definition of an investment contract security," and then concluded that the Adventure Cattle contracts lacked horizontal commonality. *Id.* at 979–80.

Plaintiffs omit from their characterization of the court's prior ruling, however, its further conclusion that "[e]ven if vertical commonality alone would suffice to make an investment contract a security, the court concludes that such commonality is also lacking in this case." *Id.* at 980. Thus, even if this court were wrong in its conclusion that horizontal commonality should be required, and the court does not retreat from that position, the court also decided that the Adventure Cattle contracts were not securities for lack of vertical commonality, which plaintiffs have asserted is the only commonality requirement in this circuit. *Id.* at 980. Furthermore, the court found that the Adventure Cattle contracts failed the third prong of the *Howey* test, the requirement that the investor expect profit from the effort of others. *Id.* at 980–82. The court also found that even if the Adventure Cattle contracts were securities, the defendants could not be held liable under the securities laws, because they were not "sellers," *DeWit,* 879 F.Supp. at 984–86, "control persons," *id.* at 986–87, or liable for failure to make disclosures. *Id.* at 987–989. Plaintiffs have not challenged any of these conclusions in their motion for reconsideration, and each would require dismissal of the pertinent securities-law claim. Thus, the court's decision contains no mani-

fest error of law, *Hagerman,* 839 F.2d at 414; *Committee for the First Amendment,* 962 F.2d at 1523, and therefore no ground pursuant to *Fed.R.Civ.P.* 59(e) for altering or amending the court's conclusion that the Adventure Cattle contracts are not securities as pleaded in the first amended complaint.

Nor are there any "exceptional circumstances" requiring the court to grant relief from its judgment, pursuant to Rule 60(b)(6), because, once again, if plaintiffs disagreed with the court's determination of whether or not the Adventure Cattle contracts were securities as pleaded in the first amended complaint, the plaintiffs could have sought redress through the usual channels by assigning as error on appeal this court's determination that there were no "securities" upon which to found securities law claims. *Atkinson,* 43 F.3d at 373; *Schultz,* 24 F.3d at 1024; *In re Zimmerman,* 869 F.2d at 1128. Thus, the securities claims as pleaded in the first amended complaint were properly dismissed and no relief from that determination is appropriate pursuant to either Rule 59(e) or Rule 60(b).

### b. Reconsideration of failure to include leave to amend

Plaintiffs next seek reconsideration of the court's March 1, 1995, order, because the court did not, as a matter of course, grant plaintiffs leave to amend to cure the deficiencies the court had found in the first amended complaint, but simply dismissed the complaint. Plaintiffs have cited no authority for the proposition that the court should have granted such leave as a matter of course, although they do cite some authority for the obvious, black-letter rule that leave to amend, in general, should be freely given. Plaintiffs then contend that their ability to cure pleading defects has been improved by extensive discovery since the first amended complaint was filed. Plaintiffs acknowledge that the court opined that many of the pleading defects could not be cured by further discovery on the RICO issue, but take that to mean that "pleading defects" might be cured by repleading. Plaintiffs argue that a repleaded RICO enterprise would cure "virtu-

ally all" of the defects the court noted in the RICO claim.[20]

Defendants counter that amendment of the complaint would be futile. They point out that plaintiffs had already amended their complaint once and had ample opportunity to do so again after defendants' motion to dismiss identified the deficiencies in the pleading of the various claims, but plaintiffs did not do so. Defendants contend that they would be prejudiced by belated amendment, because they have already expended significant resources in demonstrating the inadequacy of the first amended complaint and this court has already determined that repleading would be a futile exercise by noting that additional discovery could not salvage the RICO claim. They argue that the court should not grant repeated opportunities to amend pleadings where plaintiffs have eschewed opportunities to replead challenged claims for an extended period of time after the opposing party challenged the pleadings but before the court ruled on the motion to dismiss. Finally, defendants argue that, because plaintiffs should previously have addressed these pleading deficiencies, allowing them to do so on reconsideration would give them a forbidden second bite at the apple when they have nothing hitherto unknown to them upon which to replead their allegations.

Before turning to the standards governing whether or not the court should have granted leave to amend as a matter of course, or whether leave to amend should be granted at all, the court first notes that plaintiffs never sought an opportunity to replead or reamend the challenged complaint in any resistance to the motion to dismiss submitted to the court or in oral arguments. Rather, during the pendency of the motion to dismiss, plaintiffs stood on the adequacy of their pleadings or upon their ability to prove sufficient facts at trial to prevail on their claims. A desire to amend the complaint, it appears to the court, only surfaced when the court dismissed the complaint. The court will consider in due course whether that belated response to identification of deficiencies in the first

amended complaint is fatal to plaintiffs' request for leave now to reamend the complaint.

*i. Opportunity to replead after dismissal.* Although plaintiffs have cited no authority whatsoever for a right to replead or common practice of allowing amendment after dismissal for failure to state a claim, this court has found a large number of decisions considering the propriety of granting leave to amend following such a dismissal.

Outright dismissal, without leave to amend, is not necessarily improper. For example, in *Edgington v. Missouri Dep't of Corrections,* 52 F.3d 777 (8th Cir.1995), the Eighth Circuit Court of Appeals held that, despite the liberality with which courts are to treat pro se pleadings, the district court had not abused its discretion by dismissing without prejudice a prisoner's pro se complaint pursuant to 42 U.S.C. § 1983, because the plaintiff was free to refile the complaint. *Edgington,* 52 F.3d at 779–80 (dismissal for failure to comply with court order to replead with specificity). Thus, although the complaint here has been dismissed for failure to state a claim, that dismissal was without prejudice and does not bar plaintiffs from refiling the complaint.

Furthermore, the Eighth Circuit Court of Appeals has held that following dismissal pursuant to *Fed.R.Civ.P.* 12(b)(6), denial of leave to amend may be "entirely proper." *Dorn v. State Bank of Stella,* 767 F.2d 442, 443 (8th Cir.1985). In *Dorn,* the court held that the plaintiff did not file the motion for leave to amend until approximately three months after the district court entered its judgment of dismissal pursuant to *Fed.R.Civ.P.* 12(b)(6). *Id.* The court stated that

[a]lthough a pretrial motion for leave to amend one's complaint is to be liberally granted, different considerations apply to motions filed after dismissal. *See, e.g., Wright v. Anthony,* 733 F.2d 575, 577 (8th Cir.1984); *Hinton v. CPC International, Inc.,* 520 F.2d 1312, 1314 (8th Cir.1975).

---

**20.** Plaintiffs conceded in their motion that they could not cure the defect of lack of horizontal commonality, but reasserted their belief that horizontal commonality was not required under the

law of this circuit. Nonetheless, as we shall see, plaintiffs have attempted to replead the securities claims to allege horizontal commonality of the Adventure Cattle investment scheme.

After a complaint is dismissed, the right to amend under *Fed.R.Civ.P.* 15(a) terminates. *Czeremcha v. International Association of Machinists and Aerospace Workers,* 724 F.2d 1552, 1556 (11th Cir.1984). Although a party may still file a motion for leave to amend and amendments should be granted liberally, such a motion would be inappropriate "if the court has clearly indicated either that no amendment is possible or that dismissal of the complaint also constitutes dismissal of the action." *Czeremcha,* 724 F.2d at 1556 n. 6. Here, the district court's order of August 24, 1984 dismissed the complaint on its merits and did not grant Dorn leave to amend.

It is possible, of course, to give relief from a final judgment of dismissal under *Fed.R.Civ.P.* 60(b) [and presumably under Rule 59(e) as well], but where, as here, the motion for leave fell short of meeting the requirements of that rule in any real sense, and where, as here, the amended complaint added little, if any, of substance to the original complaint, it was not error for the district court to deny leave to amend three months after final judgment. Assuming that in present circumstances the district court had authority to grant leave to amend, its refusal to do so would be reversed only for abuse of discretion. *See Holloway v. Dobbs,* 715 F.2d 390, 392 (8th Cir.1983) (per curiam), and cases there cited. We find no such abuse here.

*Dorn,* 767 F.2d at 443–44. Thus, under *Dorn,* it is apparent that leave to amend after dismissal pursuant to *Fed.R.Civ.P.* 12(b)(6) need not be granted as a matter of course. It is further apparent that *Fed.R.Civ.P.* 15(a), the authority plaintiffs have cited as providing for leave to amend, provides no such authority in the present posture of the proceedings. *Dorn,* 767 F.2d at 443. However, the *standard* of liberally granting leave to amend found in *Fed.R.Civ.P.* 15(a) is still applicable to post-dismissal motions for leave to amend, but that liberality is tempered by examination of the circumstances under which the complaint was dismissed and under which the plaintiff seeks leave to amend. For example, the *Dorn* court observed that leave to amend should not be granted " 'if the court has

clearly indicated either that no amendment is possible or that dismissal of the complaint also constitutes dismissal of the action.' " *Id.* (quoting *Czeremcha,* 724 F.2d at 1556 n. 6). Furthermore, leave to amend may not be granted if the motion for leave to amend is unduly delayed after the dismissal of the action. *Id.* Finally, the court has authority to allow leave to amend pursuant to a proper motion for relief from the judgment of dismissal, but the court must still consider the adequacy of the proposed amendment according to much the same standards under which leave to amend pursuant to *Fed. R.Civ.P.* 15(a) may be granted, and ultimate denial of leave to amend is reviewable only for abuse of discretion. *Id.* at 444.

Cases from this circuit more recent than *Dorn* do not demonstrate the inapplicability of these standards. In *Estle v. Country Mut. Ins. Co.,* 970 F.2d 476 (8th Cir.1992), although the court of appeals ordered the district court to permit the plaintiff to amend her complaint in order to allege a claim of fraud after reversing and remanding the district court's grant of judgment on the pleadings in the defendant's favor, and applied the standards found in *Fed.R.Civ.P.* 15(a) to determining that amendment was proper, *Estle,* 970 F.2d at 480, the motion for leave to amend had been included in the plaintiff's response to the defendant's motion for judgment on the pleadings, rather than after the court had already granted the motion to dismiss, as is the case here. *Id.* at 477.

In a case more directly on point with the procedural posture of the present litigation, *Weimer v. Amen,* 870 F.2d 1400 (8th Cir. 1989), the district court granted motions to dismiss for failure to state a claim on which relief could be granted pursuant to *Fed. R.Civ.P.* 12(b)(6), and then denied the plaintiff leave to amend the complaint. *Weimer,* 870 F.2d at 1402. The court, relying on *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971), rather than *Fed.R.Civ.P.* 15(a), held that "[d]istrict courts are granted the discretion of whether to allow leave to amend complaints," and further held that review was for abuse of that discretion. *Id.* at 1406–07. The court then observed that

"[i]t is settled law that district courts have the power to deny leave to amend if the proposed changes would not save the complaint." *Id.* at 1407 (citing *Holloway v. Dobbs*, 715 F.2d 390, 392–93 (8th Cir.1983)). The court concluded that even the proposed amended complaint could not withstand a motion to dismiss, and therefore the district court's post-dismissal denial of leave to amend was proper. *Id. Weimer* therefore makes plain what was at least implicit in *Dorn*: futility of the amendment proffered post-dismissal is measured by the standards of Rule 12(b)(6) for determination of whether the proffered amendment states a claim upon which relief can be granted. The amendment will be allowed only if the amended complaint could withstand a motion to dismiss pursuant to Rule 12(b)(6). *Id.*

■ In *United States v. Maull*, 855 F.2d 514 (8th Cir.1988), the court explored the *res judicata* effect of a dismissal pursuant to Rule 12(b)(6), and found that "it is well-established that a Rule 12(b)(6) dismissal is a 'judgment on the merits' for res judicata purposes unless the plaintiff is granted leave to amend or the dismissal is reversed on appeal." *Maull*, 855 F.2d at 516 n. 3 (citing *Federated Dep't Stores v. Moitie*, 452 U.S. 394, 399 n. 3, 101 S.Ct. 2424, 2428 n. 3, 69 L.Ed.2d 103 (1981); *Carter v. Money Tree Co.*, 532 F.2d 113, 115 (8th Cir.), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2636, 49 L.Ed.2d 380 (1976); *Glick v. Ballentine Produce, Inc.*, 397 F.2d 590, 593 (8th Cir.1968)).

The only Eighth Circuit Court of Appeals authority the court has found that might support plaintiffs' assertion that the court should, as a matter of course, have allowed amendment of the complaint upon dismissing it for failure to state a claim is *Rogers v. Bruntrager*, 841 F.2d 853, 855 (8th Cir.1988). In *Rogers*, the court of appeals described as "somewhat unusual" the district court's dismissal of a second complaint "expressly without prejudice," followed by an order denying leave to amend. *Rogers*, 841 F.2d at 855. The court of appeals, however, was primarily concerned with the *res judicata* effect of the dismissal of the second complaint upon the filing of yet a third complaint against essentially the same defendants stating essentially the same claims. *Id.* The court of appeals reached the merits of the appeal rather than simply applying the *res judicata* doctrine, but upheld the district court's dismissal of the third complaint with prejudice. *Id.* The district court's dismissal of the third complaint had contained an express direction to the plaintiff "not to refile this claim again as to any of these defendants." *Id.* Certainly *Rogers* can be read, as can *Edgington*, to stand for the proposition that a dismissal of a complaint pursuant to Rule 12(b)(6) without providing in the dismissal for leave to amend the complaint is not improper where the plaintiff has the option of refiling, as opposed to amending, the complaint.

Nor is *Dorn* out of step with decisions from other circuits. Although a number of other circuit courts of appeals have recently considered whether the district court should give leave to amend to plaintiffs whose complaints have been dismissed pursuant to Rule 12(b)(6), none holds that the district court is *required* to include leave to amend in the order of dismissal.[21] Most courts of appeals

21. The court has found a number of recent decisions pertinent to this point and offers a representative survey. *See, e.g., LRL Properties v. Portage Metro Housing Auth.*, 55 F.3d 1097, 1104 (6th Cir.1995) (even when the plaintiff has moved to amend the complaint in response to a defendant's motion to dismiss for failure to state a claim, the district court is not required to grant the motion for leave to amend if it grants the motion to dismiss); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir.1995) (grant or denial of leave to amend sought in Rule 59(e) motion following dismissal for failure to state a claim was "left to the sound discretion of the district court," and there was no abuse here, despite the fact that leave to amend in such circumstances should generally be "freely grant- ed," and leave to amend is to be particularly "freely given" where the dismissal was based largely on failure to comply with the specificity requirements of Rule 9(b)); *Barrett v. Tallon*, 30 F.3d 1296, 1299 & 1301 (10th Cir.1994) (no abuse of discretion in denial of alternative motion for leave to amend accompanying motion to reconsider); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1279 (D.C.Cir.1994) (plaintiff appealing dismissal of securities claims asserted that "district court abused its discretion since courts commonly grant leave to securities fraud plaintiffs to amend their complaints if such complaints were dismissed on 9(b) grounds, and deny leave to amend only under aggravated circumstances," but appellate court held that dis-

uphold the grant or denial of motions for leave to amend, made either in response to a motion to dismiss or following the court's actual dismissal of the complaint, based upon whether or not the amended complaint cures the deficiencies identified by the court in its order of dismissal, and upon whether or not the plaintiff has bypassed earlier opportunities to amend the complaint in light of deficiencies identified by the opposing party.[22] Therefore, the court turns to application of the standards in *Dorn* to the present request for leave to amend in plaintiffs' motion to reconsider.

■ *ii. Leave to amend here.* Application of *Dorn* to the present motion to reconsider, alter, or amend the March 1, 1995, judgment of dismissal yields the following conclusions. First, a *sua sponte* grant of leave to amend need not be incorporated as a matter of course into an order dismissing a complaint pursuant to *Fed.R.Civ.P.* 12(b)(6). *Dorn,* 767 F.2d at 443–44; *see also Edging-*

*ton,* 52 F.3d at 779–80 (outright dismissal is not improper when it does not preclude plaintiff from refiling the complaint); *Rogers,* 841 F.2d at 855 (same). This court therefore committed no "manifest error of law" in failing to include such an automatic grant of leave to amend. *Hagerman,* 839 F.2d at 414; *see also Committee for the First Amendment,* 962 F.2d at 1523. Furthermore, plaintiffs here stood on their pleadings throughout the pendency of the motion to dismiss and did not indicate a desire to amend the pleadings to cure deficiencies identified by the defendants until the court had already granted the motion to dismiss for failure to state a claim. In such circumstances, courts of other circuits have held that the a motion for leave to amend made with a motion to reconsider may be denied without abuse of discretion, because the plaintiff has bypassed earlier opportunities to amend the complaint in light of identified deficiencies. *See, e.g., Barrett v. Tallon,* 30 F.3d 1296, 1299 & 1301

---

trict courts are not required to grant leave to amend *sua sponte* upon dismissal of inadequately pleaded securities claims); *Westlands Water Dist. v. Firebaugh Canal,* 10 F.3d 667, 677 (9th Cir. 1993) (dismissal without leave to amend is not necessarily abuse of discretion and was not here); *and compare Welch v. Laney,* 57 F.3d 1004, 1009 (11th Cir.1995) (district court erred in dismissing with prejudice complaint pursuant to 42 U.S.C. § 1983 without first granting opportunity to amend, because "a more carefully drafted complaint might state a claim upon which relief can be granted"); *Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995) (in dismissing for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts").

**22.** *LRL Properties v. Portage Metro Housing Auth.,* 55 F.3d 1097, 1104 (6th Cir.1995) (grant or denial of motion for leave to amend, made pursuant to Rule 15(a) in response to motion to dismiss, was reviewed according to usual Rule 15(a) standards, and " '[d]enial of [leave to amend] [was] not an abuse of discretion where "[t]he infirmities of the original complaint [were] not dissipated by the amended complaint," ' " quoting *Hamilton v. Bean,* 745 F.2d 1034, 1036 (6th Cir.1984), in turn quoting *Hohensee v. Akron Beacon Journal Publishing Co.,* 277 F.2d 359, 360 (6th Cir.), *cert. denied,* 364 U.S. 914, 81 S.Ct. 277, 5 L.Ed.2d 227 (1960)); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995) (request for leave to amend in Rule 59(e) motion following

dismissal for failure to state a claim was properly denied, because "[o]ne good reason to deny leave to amend is when such leave would be futile," and district court correctly concluded the proffered amendment was futile); *Barrett v. Tallon,* 30 F.3d 1296, 1299 & 1301 (10th Cir.1994) (no abuse of discretion in denial of post-dismissal motion for leave to amend RICO allegations where plaintiffs had stood on their pleadings even though the defendants moved to dismiss the first amended complaint shortly after it was filed); *Graham v. Independent Sch. Dist. No. I-89,* 22 F.3d 991, 993 (10th Cir.1994) (no abuse of discretion in dismissal without leave to amend where claim was legally deficient on constitutional claim under the Fourteenth Amendment); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1279 (D.C.Cir.1994) (district court was not required to grant leave to amend *sua sponte* in dismissing securities claims found deficient pursuant to Rules 9(b) and 12(b)(6), and "bare request in an opposition to a motion to dismiss— without any indication of the particular grounds on which amendment is sought ...—does not constitute a motion within the contemplation of Rule 15(a)"); *Westlands Water Dist. v. Firebaugh Canal,* 10 F.3d 667, 677 (9th Cir.1993) (denial of request for leave to amend made after dismissal of complaint was not abuse of discretion, because "the district court's discretion is particularly broad where the plaintiff has bypassed other opportunities to amend," and denial was proper here where plaintiffs had filed no motion to amend and gave no indication of a desire to do so until after the district court rendered its decision on motion for judgment on the pleadings).

(10th Cir.1994) (plaintiffs stood on pleadings and court therefore did not abuse its discretion in denial of post-dismissal motion for leave to amend RICO allegations); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1279 (D.C.Cir.1994) (district court was not required to grant leave to amend *sua sponte* in dismissing securities claims found deficient pursuant to Rules 9(b) and 12(b)(6) where plaintiff made only "bare request" for leave to amend prior to dismissal); *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 677 (9th Cir.1993) (denial of request for leave to amend made after dismissal of complaint was not abuse of discretion, because plaintiffs had bypassed other opportunities to amend by failing to file a motion to amend or giving other indication of a desire to amend until after the district court rendered its decision on motion for judgment on the pleadings). Again, the court committed no "manifest error of law" in not reading plaintiffs' minds and granting leave to amend before it was requested, *Hagerman*, 839 F.2d at 414, and would not abuse its discretion by denying leave to amend now. *See, e.g., Barrett*, 30 F.3d at 1301; *Kowal*, 16 F.3d at 1279; *Westlands Water Dist.*, 10 F.3d at 677.

Next, although Rule 15(a) and the case law that has grown up around it may articulate *standards* that are also applicable to whether or not leave to amend should be granted *after* dismissal of the complaint, Rule 15(a) does not provide the *authority* for plaintiff's request for leave to amend here. *Dorn*, at 443–44. Nor would it be proper for the court to grant leave to amend here without first granting plaintiffs relief from the judgment of dismissal. Although the court expressed only doubt that amendment was possible without stating that there was no possibility of curing each and every defect identified, the court did indicate that dismissal of the complaint also constituted dismissal of the action. *Id.* Plaintiffs were therefore correct in their response to defendants that they could not file a proposed amended complaint until they had first obtained amendment of or relief from the March 1, 1995, order allowing them to do so. *Id.*

Yet, the court concluded above that there was no "manifest error of law" requiring the court to alter or amend its judgment of dismissal *pursuant to Rule 59(e)* to provide for leave to amend—a conclusion that would seem to preclude granting plaintiffs relief from the dismissal to allow amendment of the deficient complaint. However, Rule 60(b) provides further grounds for relief from the dismissal, including the "catch-all" ground of "any other reason justifying relief from the operation of the judgment" found in *Fed. R.Civ.P.* 60(b)(6), if plaintiffs can show the requisite "exceptional circumstances" required for relief under that rule. *See Dorn*, 767 F.2d at 444 (relief from the dismissal to allow for amendment of a deficient complaint could be obtained pursuant to Rule 60(b)). The court is reluctant to allow plaintiffs to have it both ways, allowing them to obtain relief pursuant to whichever rule might be most advantageous to them, in the court's determination, when plaintiffs have signally failed to identify the authority for their motion and left to the court's "somewhat unenlightened guess" the basis for that motion. *See Sanders*, 862 F.2d at 168–69.

However, the court reads the standards for relief from judgment under Rules 59(e) and 60(b) to require the court ultimately to consider how justice can best be served, not whether or not the attorneys for the losing side have done their job in identifying the basis for the relief the *party* may wish to obtain. The court therefore turns to the question of whether Rule 60(b), instead of Rule 59(e), would provide for relief from the March 1, 1995, ruling to permit filing of the second amended complaint. The court notes first that neither the plaintiffs' failure to make a request for leave to amend prior to dismissal or the court's failure to include leave to amend in its order dismissing the first amended complaint constitutes "exceptional circumstances" necessary for the extraordinary relief plaintiffs request. *See, e.g., One Parcel*, 51 F.3d at 119; *Mitchell*, 48 F.3d at 1039. There was no "inadvertence," "mistake," or "excusable neglect" apparent in plaintiffs' standing on their pleadings instead of seeking leave to amend, but a conscious decision to pursue that strategy. Thus, Rule 60(b)(1) provides no justification for relief from judgment of dismissal here. Nor would

any of the first five grounds for relief from judgment stated in Rule 60(b) apply to the court's failure to include leave to amend in its order for dismissal. *See Fed.R.Civ.P.* 60(b)(1)–(5).

■ However, although the plaintiffs have recourse to the court of appeals to redress improper dismissal of the first amended complaint, *Atkinson,* 43 F.3d at 373; *Schultz,* 24 F.3d at 1024; *In re Zimmerman,* 869 F.2d at 1128, they do not have such recourse to test the adequacy of the repleaded complaint. Because plaintiffs have indicated a willingness to abandon the first amended complaint in favor of the second amended complaint, it seems to the court that appeal of dismissal of the first amended complaint becomes an exercise in futility. It would be far better for everyone involved, including the parties, the district court, and the court of appeals, if the court were to rule on the adequacy of the second amended complaint prior to any appeal. These circumstances may be sufficiently exceptional to make extraordinary relief pursuant to Rule 60(b)(6) appropriate, allowing relief from the March 1, 1995, to the extent that a second amended complaint could be filed. *Atkinson,* 43 F.3d at 373; *Schultz,* 24 F.3d at 1024; *In re Zimmerman,* 869 F.2d at 1128. Furthermore, *Dorn* suggests that relief from judgment pursuant to Rule 60(b) may appropriately be granted to allow the court to consider the adequacy of an amended complaint proffered after dismissal. *Dorn,* 767 F.2d at 444. Therefore, in an excess of caution to afford plaintiffs every opportunity for a just consideration of their claims, in an effort to save the parties considerable time and expense, and in order to save the court from the necessity of inefficiently reconsidering the proffered second amended complaint anyway as a new complaint in a refiled action, the court will now consider the adequacy of the proffered second amended complaint. The court will grant leave to amend only to the extent that the second amended complaint cures the deficiencies identified in the first amended complaint or can be shown not to be futile. *Id.; see also Weimer,* 870 F.2d at 1407.

### 3. Summary Regarding The Motion For Reconsideration

Plaintiffs' motion for reconsideration is therefore denied as to any alleged error in considering the lack of horizontal commonality of the Adventure Cattle contracts as fatal to the securities allegations as pleaded in the first amended complaint. Plaintiffs' motion for reconsideration is denied, to the extent that it was made pursuant to *Fed.R.Civ.P.* 59(e), as to alleged error in failing *sua sponte* to grant leave to amend, but the court will nonetheless consider plaintiffs' alternative motion for leave to amend pursuant to *Fed. R.Civ.P.* 60(b)(6). Defendants' motion to strike the proffered second amended complaint is denied to the extent that the court will give consideration to the adequacy of the proffered second amended complaint. The court therefore turns next to the adequacy or futility of the second amended complaint in its effort to decide whether to permit the proffered amendment.

### B. Adequacy Of The Second Amended Complaint

Although plaintiffs' counsel indicated at oral arguments that the motion to reconsider sought relief primarily to replead the RICO allegations, the proffered second amended complaint also repleads the securities allegations. The court must therefore consider the adequacy or futility of the repleaded allegations supporting both the securities and RICO claims.

### 1. Repleaded securities claims

Plaintiffs have attempted to replead the securities claims to establish that the Adventure Cattle contracts had both horizontal and vertical commonality, and therefore were investment contract securities. They allege that investor funds were "pooled" with funds of other investors and with Morken in the "kite" accounts at Firstar Milwaukee, that Morken made all decisions concerning the cattle, that investor cattle were pooled with the cattle of other investors and Morken to make saleable lots, that each investor received his pro rata share of profits from such sales, and that plaintiffs did indeed have an expectation of profits tied exclusively and

directly to Morken's skill, efforts, and fortuity. Plaintiffs argue that the court incorrectly looked at only the investment decisions, and not the day-to-day operations decisions, of the Adventure Cattle scheme, which plaintiffs contend "eviscerates" *Howey*, because individual investors always make decisions about the timing of investments. They argue further that the court incorrectly concluded that plaintiffs retained the right to "pursue alternatives" with their cattle, when in fact Morken made all decisions and the investors were totally dependent on him. Plaintiffs contend further that the word "guaranteed" never appears in reference to the return plaintiffs could expect on their investments. Rather, plaintiffs now allege that they were led to expect "profits" from their investment in cattle and that those profits were protected by Morken's other enterprises being able to make money even when cattle sales did not. Finally, plaintiffs contend that the cattle investment scheme here is very like the investment in individual parcels in citrus groves held to be a "security" in *Howey*, because both involved promises of profits from the entire operation.

Defendants reiterate that even as repleaded, plaintiffs cannot assert that there was a horizontal "pooling" or investment in shares in an undivided interest in Morken's entire herd. Rather, each investor still owned only his or her own head of cattle, and obtained a return on those head of cattle, not some pro rata distribution of profits from an entire investment based on shares in the undivided interest. Defendants also reiterate that the return on the investment here was not in fact "profits" from the investment, but a guaranteed return protected by Morken's profits from other business enterprises. Thus, defendants assert that the only commonality among investors was that Morken was a party to each contract. Defendants attack plaintiffs' argument that "pooling" of cattle to make saleable lots in any way represented a "pooling" of investments in the common enterprise. Defendants also argue that there was no vertical commonality, because the return promised investors was not linked in any way to Morken's fortunes or efforts, but guaranteed. Thus, the only fortuity in the investment was the amount of cattle investors could afford to purchase. Defendants acknowledge that the repleaded complaint demonstrates that Morken's profits may have depended on his efforts, but that plaintiffs' return on their investments did not. The payoff to investors was a fixed cost of Morken's operations, over which he enjoyed profits and under which he suffered losses. Reliance on solvency of the promoter, defendants assert, is not the same as relying on the promoter's efforts. Defendants reiterate that expectation of a specified interest payment is not the apportionment of profits, citing *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1540 (10th Cir.1993), and that plaintiffs had no anticipation of risk, because of the guaranteed return on their investment.

In assessing the adequacy or futility of the repleaded allegations, the court reiterates that it must apply to that assessment the test of whether the repleaded complaint could withstand a motion to dismiss for failure to state a claim pursuant to *Fed.R.Civ.P.* 12(b)(6). *Weimer,* 870 F.2d at 1407; *Dorn,* 767 F.2d at 444. The court is mindful that in treating the factual allegations of a complaint as true pursuant to Rule 12(b)(6), the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts." *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990) (citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987), and 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 595–97 (1969)); *see also LRL Properties,* 55 F.3d at 1103 (the court "need not accept as true legal conclusions or unwarranted factual inferences," quoting *Morgan,* 829 F.2d at 12). Plaintiffs' repleaded allegations are frequently cast in conclusory terms matching those of the RICO and securities statutes or in terms matching the standards articulated by case law as applicable to statement of a cause of action under the statutes. Such conclusory allegations need not and will not be taken as true; rather, the court will consider whether the *facts* alleged in the second amended complaint, accepted as true, are sufficient to state a claim upon which relief can be granted. *Westcott,* 901 F.2d at 1488.

#### a. Commonality

###### ■ i. Horizontal commonality. In *DeWit,* 879 F.Supp. at 978–79, this court noted that the horizontal commonality requirement has caused courts to see if the investor, like a purchaser of a share of stock, has an "undivided interest in an enterprise, entitling the owner to a pro rata share in the enterprise's profits," and whether there is also a "pooling" of profits. *Wals v. Fox Hills Development Corp.,* 24 F.3d 1016, 1018 (7th Cir.1994) (citing *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 851, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975)); *Revak v. SEC Realty Corp.,* 18 F.3d 81, 87 (2d Cir. 1994). Plaintiffs have attempted to replead their characterization of the Adventure Cattle scheme to include these elements.

Here, the court is asked to infer that because *Morken* "pooled" cattle of several investors to make up saleable lots, the "profits" from those sales were "pooled" in Morken's accounts prior to distribution to individual investors, and the distribution of proceeds was made "pro rata" to the investors based on the number of cattle they owned in the lot sold, that the necessary "pooling" of interests and profits has occurred, making the Adventure Cattle contracts *as they actually functioned* into "securities," even though plaintiffs acknowledged that the contracts on their faces might not be securities. Such a legal conclusion and the factual inferences upon which it is based are unwarranted.

Plaintiffs' error, however, does *not* lie in looking beyond the face of the contract to examine how the investment actually "worked." *See, e.g., Howey,* 328 U.S. at 299–300, 66 S.Ct. at 1103–1104 (looking at the workings of the investment, not just the face of the contracts involved). Rather, it lies in drawing improper conclusions and inferences from the way the investment actually worked. *Westcott,* 901 F.2d at 1488. Plaintiffs' second amended complaint, even though it constantly refers to "pooling" of investor cattle, does not change the fact apparent from the Adventure Cattle contracts and the second amended complaint, that plaintiffs each owned specific head of cattle and received a return only on the sale of those head of cattle. How Morken may have managed the sale of those cattle and handled the proceeds prior to paying off investors is immaterial here. Plaintiffs did not own shares in an undivided interest in Morken's herds; they owned specific cattle. *Wals,* 24 F.3d at 1018. Nor did they receive a pro rata distribution of profits from the success of the enterprise as a whole based on their "share" in the enterprise; rather, they received the promised return for each head of cattle they owned. *Revak,* 18 F.3d at 87.

These points bear further discussion. In *Wals,* the Seventh Circuit Court of Appeals distinguished investments with horizontal commonality, on the basis of ownership of undivided interests, from the condominium investment scheme before it, because

> [t]he owner of a condominium does not own an undivided share of the building complex in which his condominium is located. He owns his condominium, and if it is rented out for him by the developer he receives the particular rental on that unit rather than an undivided share of the total rentals of all the units that are rented out. The nature of his interest thus is different from that of a shareholder in a corporation that owns rental property.

*Wals,* 24 F.3d at 1018. Similarly, in *Revak,* the Second Circuit Court of Appeals found horizontal commonality in another housing scheme:

> Plaintiffs do not allege, and the SEC Realty defendants vehemently deny, that any rent-pooling arrangement existed among the Lake Park investors. The rents and expenses attributable to each unit were not shared or pooled in any manner, but were instead the sole responsibility of the unit owner. Plaintiffs owned individual units, and could make profits or sustain losses independent of the fortunes of other purchasers. There are simply no indicia of horizontal commonality. The fact that many purchasers employed the services of Harvey Freeman & Sons, Inc. in renting their units establishes, at most, a common agency, not a common enterprise. *See Lavery v. Kearns,* 792 F.Supp. 847, 857–59 (D.Me.1992) (no horizontal commonality where unit owners executed separate contracts with a common marketing agent).

Accordingly, the Lake Park venture does not constitute a common enterprise within the meaning of *Howey* and the sale of the Lake Park condominium units cannot be considered the sale of securities for purposes of the federal securities laws. *Revak*, 18 F.3d at 88. In contrast, the Fourth Circuit Court of Appeals, while rejecting the necessity of horizontal commonality, nonetheless distinguished the case before it in *Teague v. Bakker*, 35 F.3d 978 (4th Cir.1994), from that in *Wals* or *Revak* in part on the basis that horizontal commonality did exist in its case. *Teague*, 35 F.3d at 986 n. 8. In *Teague*, there was a pooling of rent and expenses and no ownership of a particular unit. *Id.* at 982.[23] In the present case, even as the investment is alleged to have worked in the repleaded complaint, the plaintiffs allege only that they owned specific head of cattle, were responsible for the costs of feeding and maintaining only those specific cattle, and received a promised or guaranteed return only as to those cattle. Thus, their *investment* was not pooled with the investment of others in a common enterprise. Instead, Morken's management of each investor's specific group of cattle was, even as alleged in the second amended complaint, "a common agency, not a common enterprise," in which Morken may have "pooled" lots of cattle belonging to different investors to make up saleable lots, but in which the investors' interests in the cattle were not "pooled." *Revak*, 18 F.3d at 88.

Nor was there a "pro rata" distribution of "profits" in the Adventure Cattle scheme. *Revak*, 18 F.3d at 87. Rather, even as alleged in the second amended complaint, each investor received a specified return for each head of cattle owned by the investor regardless of whether the sale of the "pooled" lot to which the investor's cattle had been added generated a "profit" or not. Those returns were never "pooled" and redistributed pro rata, even if the proceeds of the sale of a lot of animals were "pooled" in Morken's accounts, because payment of funds into Morken's accounts was no more than an incidental step in the book-keeping process leading to payment by Morken of the promised per head return to the investors. In other words, the proceeds per head passed through Morken's accounts without ever being increased or lessened by "pooling" and redistribution to spread adverse or advantageous performance among the investors. Furthermore, the return per head of cattle was not necessarily tied in any way to the performance, i.e., the sale price, for the lot at the time of sale nor to any advantage supposedly gained by the investor from combining the lots of cattle belonging to several investors. Rather, the second amended complaint alleges plainly that the return per head would be paid, out of Morken's assets if necessary, regardless of how the sale of an individual investor's lot of cattle or the combined lots of several investors actually performed. Thus, the return to any individual investor was not only independent of that paid to any other investor, but independent of the performance of the investor's own lot of cattle.

The plaintiffs assert that the repleaded complaint demonstrates that the investment here was more like the investment in the citrus groves found to be a security in *Howey* than the condominium investment schemes held not to be securities in *Revak* and *Wals*. In *Howey*, the Supreme Court held that, although each investor owned a specific parcel of land in the citrus grove,

> individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments. Their respective shares in this

---

**23.** The court admits to one error in its prior decision: in *DeWit*, 879 F.Supp. at 980, the court likens the Adventure Cattle investments to the "condominium contracts in *Teague*," when in fact the court meant to liken the contracts to the "condominium contracts in *Wals* and *Revak*." The court believes that its further discussion of the characteristics establishing the lack of horizontal commonality dispelled any misconception caused by its reference to the wrong condominium contracts.

enterprise are evidenced by land sales contracts and warranty deeds, which serve as a convenient method of determining the investors' allocable shares of the profits. The resulting transfer of rights in land is purely incidental.

Thus, all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise....

*Howey,* 328 U.S. at 300, 66 S.Ct. at 1103. There are, however, significant differences between the cattle investment scheme here and the citrus grove investment in *Howey.* As the Fourth Circuit Court of Appeals noted in *Bailey v. J.W.K. Properties, Inc.,* 904 F.2d 918 (4th Cir.1990), "unlike the citrus grove in *Howey,* cattle are easily moved." *Bailey,* 904 F.2d at 925. Because cattle are mobile, and each investor could own specific animals, the individual ownership of specific head of cattle here is more significant than ownership of a specific parcel of land in an otherwise undifferentiated tract of citrus grove in *Howey.* Here, each investor actually paid the costs of raising specific animals, and received a return per head upon the sale of those specific animals. In *Howey,* as a practical matter, there was no way for the individual parcel owner to pay the expenses only of his or her parcel and receive a return only for that parcel. Thus, the ownership of a parcel of land in *Howey* was no more than a surrogate for ownership of an undivided share in the entire enterprise, *id.,* but ownership of specific cattle here is not simply such a surrogate for an undivided share in Morken's entire herd. Furthermore, there was no necessity to the *investor* in the Adventure Cattle scheme for his or her cattle be combined with those of other investors in order to make the investment economically feasible, as there was to make a citrus grove economically feasible. *Cf. Howey,* 328 U.S. at 300, 66 S.Ct. at 1103. The individual investor's cattle could have been raised and marketed any number of ways, either by placement at any number of feed lots and sale with any number of possible lots of cattle or as an individual lot. Morken undertook to manage those parts of the enterprise

on behalf of each investor, but again, that demonstrates no more than a "common agency," not a common enterprise. *Revak,* 18 F.3d at 88.

The line between a "common agency" and a "common enterprise" can be crossed, as it was in *Long v. Shultz Cattle Co., Inc.,* 896 F.2d 85 (5th Cir.1990) (en banc), a case discussed in this court's prior ruling. *DeWit,* 879 F.Supp. at 982–83. In *Long,* although each investor ostensibly paid a flat consulting fee of $20 per head of cattle, the investment package actually offered involvement in a common enterprise in which hundreds of investors invested in a cattle raising operation actively supervised by the promoter, and assets were pooled to purchase the cattle, resulting in each investor's ownership of an undivided interest in the cattle poundage in one or more pens. *Long,* 896 F.2d at 87. In the Adventure Cattle program, however, the investors each owned their own cattle and there was no pooling of assets to purchase a herd of cattle resulting in ownership by each investor of a undivided share in the cattle poundage in some lot of cattle. Exhibit C, p. 1; Second Amended Complaint, ¶¶ 47.a. & d. Furthermore, the investors in *Long,* unlike the investors in the Adventure Cattle program, did share among themselves the risks of cattle loss and the various expenses of feeding the entire group of cattle. *Id.* Although Morken bore "[a]ny and all death loss" on each investor's cattle under the terms of the Adventure Cattle contract, Exhibit C, p. 1, that risk was not shared among the investors, and each investor in the Adventure Cattle program remained responsible for the feed and yardage costs for his or her own specific head of cattle. Exhibit C, p. 1; Second Amended Complaint, ¶ 47.d.

Likewise, in *Barry v. Ceres Land Co., Inc.,* Fed.Sec.L.Rep. ¶ 99,008, 1978 WL 960 (D.Minn.1978), in which another cattle feeding investment was held to a security, "common enterprise" characteristics distinguish the case from the Adventure Cattle program. In *Barry,* the promoter agreed to manage a cattle feeding investment on behalf of a group of investors. *Barry,* 1978 WL 960, *1–2. The investment agreements required the promoter to purchase the cattle, care for

them, feed them, market them, and provide a closing statement, remitting proceeds after deducting the promoter's fees and expenses and repaying loans. *Id.* at *2. The promoters also provided a "stop loss" agreement in which each investor was indemnified against loss in excess of a specified amount, usually $100, per animal purchased by the investor. *Id.* Investors paid $100 per head, with the understanding that the promoters would procure the necessary additional financing on behalf of the investors, and also paid the promoters a "feeding fee" of $12 per ton of feed consumed by the cattle in addition to the cost of the feed. *Id.* The manner in which the investment functioned, however, obliterated any element of individual ownership of individual animals:

> Although the cattle feeding agreements provided that the two plaintiffs and each of the other 14 investors in Pool V were to own a specific number of separately identified animals, Ceres treated each of the 16 investors in Pool V as owning a percentage of the entire herd, together with all of the risks of loss and expectations of profit that such a percentage ownership entailed. There was no way of identifying any specific Pool V animal as being owned by any specific Pool V investor but Pool V cattle were kept separate from other herds of cattle.

*Id.* The district court found that the investment met all three of the *Howey* factors, and was therefore a "security." *Id.* at *7. As to common enterprise, the court found that "[p]laintiffs' cattle were pooled with the cattle of the other Pool V investors." *Id.* The court also found that investors had an "expectation of profits," because the plaintiffs testified that they entered into the agreement with the expectation of profits and purported tax benefits were secondary. *Id.* The court also found that the profits were expected to arise from the efforts of the promoter and third parties, because "there can be little doubt that plaintiffs relied on Ceres' entrepreneurial and managerial efforts." *Id.* at *8.

Looking only at the issue of common enterprise for the moment, the Adventure Cattle scheme is distinguishable from that in *Barry* in critical ways. First, there was no pooling of cattle such that the plaintiffs were treated as owning a percentage of the entire herd, together with all of the risks of loss and expectations of profit that such a percentage ownership entailed. Even as repleaded, the Adventure Cattle contracts and the "workings" of the investment provided that each investor owned specific head of cattle, Exhibit C, p. 1; Second Amended Complaint, ¶ 47.-a., and bore the expenses of feed and yardage for those specific cattle, Exhibit C, p. 1; Second Amended Complaint, ¶ 47.d., not shares of the herd and shares in the expenses of an entire herd. Unlike the investors in *Barry*, who relied on the promoter to arrange the financing for the entire group of investors, in the Adventure Cattle scheme, the investors each arranged their own individual financing for the purchase of their own cattle. Second Amended Complaint, ¶ 47.b. While in *Barry*, it is apparent that the investors as a group shared the risk of loss, with the promoter providing a "stop loss" or "floor" for losses, in the Adventure Cattle scheme, risk of loss was borne entirely by Morken and was not shared among the investors. Exhibit C, p. 1. Similarly, the investors in *Barry* had an expectation that they would share among the group any profits derived from the sale of the entire Pool V herd, but in the Adventure Cattle scheme, there was no sharing of whatever profits might arise from the sale of the lot of cattle in which an individual investor's cattle were sold, because each investor received the same, predetermined return whatever the sale price per head of the lot of cattle might be and whatever expenses of the individual investor had to be reimbursed first.[24] Exhibit C, p. 2, numbered ¶ 3.

Thus, plaintiffs' allegations of "pooling" are unwarranted inferences or legal conclusions contrary to the *facts* as pleaded in the second amended complaint, which, treated as true, demonstrate that there was no "pooling" of the investments of the investors. *Westcott,*

---

**24.** The court will return, in the proper place, to the differences between the expectation of profit shared among a group of investors in *Barry* and the expectation of a promised return in the Adventure Cattle scheme.

901 F.2d at 1488 (court does not accept as true pleader's legal conclusions or unwarranted inferences of fact). Consequently, there was no horizontal commonality upon which the "common enterprise" prong of the *Howey* test could be met. Assuming, contrary to this court's stated view, *see DeWit,* 879 F.Supp. at 979–80, that vertical commonality alone is sufficient to establish the "common enterprise" element under *Howey,* the court will consider the plaintiffs' new allegations in support of their assertion that the repleaded complaint establishes a "common enterprise" by vertical commonality.

**ii. Vertical commonality.**
Plaintiffs have also attempted to meet the "common enterprise" element of the *Howey* test by repleading allegations of vertical commonality. Although the plaintiffs explicitly plead that plaintiffs' fortunes were tied either to Morken's efforts or to his fortunes, *see* Second Amended Complaint, ¶¶ 47.g. & i. & ¶¶ 110–113, the standards for finding vertical commonality, *see Revak,* 18 F.3d at 88, *S.E.C. v. Eurobond Exchange, Ltd.,* 13 F.3d 1334, 1339 (9th Cir.1994),[25] these conclusory allegations are unwarranted factual inferences or legal conclusions in light of the *facts* actually pleaded in the second amended complaint. *Westcott,* 901 F.2d at 1488.

What the plaintiffs' new allegations lack is the "direct correlation ... between success or failure of [the promoter's] efforts [or fortunes] and success or failure of the invest-

ment." *Eurobond Exchange,* 13 F.3d at 1339. The Adventure Cattle contracts on their face and as pleaded in the second amended complaint undeniably place a great deal of responsibility *for the cattle* on Morken. However, even as repleaded, Morken's and the investors' fortunes are entirely "uncorrelated." The repleaded allegations do not and cannot change the fact that

> the investors' fortunes were quite independent of Morken's, because each had been guaranteed a specific return on their investment. Morken enjoyed success beyond the guaranteed performance, and suffered performance below it—investors did not, at least not until the complete collapse of the scheme.

*DeWit,* 879 F.Supp. at 980. Morken's personal fortunes, ranging beyond the cattle investment scheme to include his other enterprises, were put at the disposal of the investors should the cattle feeding and marketing scheme fail to produce adequate returns alone, thus ensuring that the investors' fortunes were guaranteed to improve, while Morken's fortunes, not just with the cattle scheme, but with everything else he had pledged to guarantee the success of the Adventure Cattle scheme, could fluctuate wildly. *See* Second Amended Complaint, ¶ 47.h. Furthermore, while Morken's fortunes would obviously suffer if the investors' cattle died or required veterinary services, because Morken undertook to bear the costs of health

---

**25.** In *Revak,* the Second Circuit Court of Appeals explained vertical commonality as follows:

> In an enterprise marked by vertical commonality, the investors' fortunes need not rise and fall together; a pro-rata sharing of profits and losses is not required. Two distinct kinds of vertical commonality have been identified: "broad vertical commonality" and "strict vertical commonality." To establish "broad vertical commonality," the fortunes of the investors need be linked only to the efforts of the promoter. *See Long v. Shultz Cattle Co., Inc.,* 881 F.2d 129, 140–41 (5th Cir.1989). "Strict vertical commonality" requires that the fortunes of investors be tied to the fortunes of the promoter. *See Brodt v. Bache & Co.,* 595 F.2d 459, 461 (9th Cir.1978).

*Revak,* 18 F.3d at 88. Similarly, in defining a "common enterprise" solely in terms of vertical commonality, the Ninth Circuit Court of Appeals wrote:

> [a] common enterprise is a venture "in which the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment....' " It is not necessary that the funds of investors are pooled; what must be shown is that the fortunes of the investors are linked with those of the promoters, thereby establishing the requisite element of vertical commonality. Thus, a common enterprise exists if a direct correlation has been established between success or failure of [the promoter's] efforts and success or failure of the investment.

*Eurobond Exchange,* 13 F.3d at 1339 (quoting *S.E.C. v. Goldfield Deep Mines Co. of Nevada,* 758 F.2d 459, 463 (9th Cir.1985), in turn quoting *Brodt v. Bache & Co.,* 595 F.2d 459, 460 (9th Cir.1978) (quoting *Securities and Exchange Comm'n v. Glenn W. Turner Enter.,* 474 F.2d 476, 482 n. 7 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973)), with other citations omitted).

services and any death loss, the investors' fortunes were in no way blackened. Exhibit C, p. 1.

Furthermore, the Adventure Cattle contracts specifically uncoupled the success of Morken's *efforts* in raising and marketing the cattle from the investors' success with the investment. If Morken's efforts were highly successful, reaping huge returns on the sale of the investors' cattle, only Morken enjoyed the fruits of that success, because the return to the investors did not change. The investors were obligated under the contract to pay over to Morken "[a]ny and all funds generated by the sale of the cattle above the gross investment by the Investor following the payment of the 25% return." Exhibit C, p. 2, numbered ¶ 3. On the other hand, if Morken's efforts did not produce sufficient return on the cattle, pursuant to numbered paragraphs three and four of the sample contract, Exhibit C, p. 2, Morken undertook to "issue a check in an amount sufficient to equal the gross amount of funds and the 25% return to the Investor." *See* Second Amended Complaint, ¶ 47.h. (identifying the sources from which Morken would provide the necessary capital). The fact that Morken ultimately could not perform the promises in the contracts does not make them securities subject to laws prohibiting securities fraud, although the allegations that Morken and others may have misrepresented Morken's ability to fulfill those promises may state a common-law fraud claim.

On what, then, did the success or fortunes of the investors depend? The only part of the investment scheme in which investors could enjoy lesser or greater return was the part entirely out of Morken's hands. Under the Adventure Cattle scheme, each investor negotiated the financing of the investor's investment. The investor alone was responsible for paying the interest and other expenses of that financing, presumably out of the guaranteed return on the Adventure Cattle contract. *See* Second Amended Complaint, ¶ 47.b. & c. If the investor was able to negotiate a particularly favorable interest rate on that financing, the investor would enjoy a greater net return on the investment after paying those loan expenses out of the return from the sale of the cattle. If the investor negotiated a less favorable interest rate on that financing, the investor enjoyed a lesser net return. Similarly, the investor determined how many cattle to purchase, thus determining the investor's return. As the court observed in its prior ruling

> Morken did not make the decisions upon which the success of any particular investment depended: he did not arrange the financing for the investors and did not decide how many cattle to buy when, nor when to sell out of a particular group of cattle. Those decisions remained in the hands of the investors.

*DeWit,* 879 F.Supp. at 980. Plaintiffs argue that this conclusion guts the *Howey* test, because investors usually determine the financing of their investments and determine how much to invest. Plaintiffs mistake the court's point. The court is not saying that any time an investor arranges the investor's own financing, the investment is not a security. Rather, the court is saying that in the circumstances alleged to be true here, the only aspect of the investment that could improve or limit its success was the terms of the financing of the initial investment, and that aspect was, in this case, in the hands of the investor. The situation here may be further contrasted with that in *Barry* in which the investors in fact shared the benefits or detriments of the financing arrangements negotiated on behalf of the common enterprise by the promoters. *Barry,* 1978 WL 960, *2.

The court finds that even as repleaded, the Adventure Cattle scheme lacked the requisite vertical commonality. Therefore, the Adventure Cattle scheme did not involve the sale of securities, and filing of the repleaded securities claims would be futile. *Weimer,* 870 F.2d at 1407; *Dorn,* 767 F.2d at 444. Despite this conclusion, however, the court will also consider the adequacy of the repleaded allegations asserting expectation of profits solely from the efforts of others, the final prong of the *Howey* test.

#### b. *Expectation of profit from the effort of others*

█ In its prior ruling, the court determined that the Adventure Cattle contracts

did not meet this prong of the *Howey* test, because there was no expectation of "profits." *DeWit,* 879 F.Supp. at 981–82. Rather, the court found that Adventure Cattle investors received a guaranteed 25% annualized return on their investment, or a "specified interest payment from the investment." *Id.* at 982. Plaintiffs contend that the word "guaranteed" never appears in reference to the return plaintiffs could expect on their investments in either the Adventure Cattle contracts or in the second amended complaint, although it figured prominently in the first amended complaint. *Compare* First Amended Complaint, ¶ 26.d., *with* Second Amended Complaint, ¶ 47.e. In the second amended complaint, the promised return is instead described as "the calculated 25 percent return on equity." Second Amended Complaint, ¶ 47.e. Plaintiffs now allege that they were led to expect "profits" from their investment in cattle and that those profits were expected from Morken's efforts, Second Amended Complaint, ¶ 47.g.–i., ¶¶ 111–112, and protected by Morken's other enterprises being able to make money even when cattle sales did not. *Id.* at ¶ 47.h.

Merely changing the name for the return, however, will not make it "profits," nor will striking the word "guaranteed" mean that the court must accept any of these allegations as true. Once again, the court cannot blindly accept plaintiffs' legal conclusions and unwarranted inferences as facts. *Westcott,* 901 F.2d at 1488. The sample contract, Exhibit C, on its face shows that the return on

the investment was guaranteed: Morken was required to make up any deficiency in the return up to the promised 25% annualized return, and the investor was required to hand over to Morken any amount in excess of the promised 25% return. The return here amounts to no more than a specified interest payment for the use of the investors' money. As the court observed in its prior ruling, " 'the receipt of specified interest payments is not the apportionment of profits under *[United Housing Found. v.] Forman,* [421 U.S. 837, 852–53, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621 (1975) ].' " *DeWit,* 879 F.Supp. at 981 (quoting *Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1540 (10th Cir.1993) (hereinafter "RTC")).[26] In light of the failure of the repleaded complaint to change this aspect of the Adventure Cattle scheme, indeed the impossibility of changing these facts in light of the express language of the contract, the plaintiffs cannot plead that the Adventure Cattle scheme meets this "expectation of profits" prong of the *Howey* test.[27] The repleaded securities claim is therefore futile and may not be filed. *Weimer,* 870 F.2d at 1407; *Dorn,* 767 F.2d at 444.

Even were this not so, if the specified return on the investment could be construed to be profits, the court would nonetheless find the repleaded complaint inadequate on this final prong of the *Howey* test. Looking to the involvement of the parties in the investment scheme, rather than to whether or not investors had an expectation of profits,

**26.** The court also cited the following cases for the proposition that the receipt of specified interest rate is not the apportionment of profits: *McVay v. Western Plains Serv. Corp.,* 823 F.2d 1395, 1399 (10th Cir.1987); *Uselton v. Commercial Lovelace Motor Freight, Inc.,* 940 F.2d 564, 576–77 & n. 10 (10th Cir.) (finding "profits" element met by employee benefit plan that yielded a profit through dividend distribution and appreciation in the value of the stock allocated to their accounts, unlike other benefit plans previously held not to meet the "profit" prong because they paid fixed or determinable benefits based on factors such as the age at which the participant retired), *cert. denied sub nom. Pepsi-Co, Inc. v. Uselton,* 502 U.S. 983, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991); *Kansas State Bank in Holton v. Citizens Bank of Windsor,* 737 F.2d 1490, 1495 (8th Cir.1984); *Union Planters Nat'l Bank of Memphis v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1184–85 (6th Cir.),

*cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1991); *American Fletcher Mortgage Co. v. United States Steel Credit Corp.,* 635 F.2d 1247, 1254 (7th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981).

**27.** Undeniably, Morken could expect profits, and could expect them only from his own efforts. Morken was the only direct participant in the Adventure Cattle scheme with such an expectation, however. Morken received the profits of the scheme after paying all expenses, including the promised 25% annualized return to the financiers/investors, if indeed there were any profits to be had merely from the sale of cattle. Morken could expect that his profits would be increased the more successful were his efforts. However, the investors were insulated from all of these concerns by the guaranteed flat return even if Morken did nothing.

*Teague,* 35 F.3d at 986 n. 7, the court still finds that, even as repleaded, the investors did not look to Morken for expertise to make their investments profitable. The court has concluded above that even as the scheme is alleged to have worked under the repleaded allegations, the only reasonable inference is that the Adventure Cattle investors did not rely on Morken's efforts or expertise at all, but on his promise to pay a guaranteed return on their investment. Hence, the only variables in the investment scheme that determined its profitability were those in the hands of the investors: timing of the investment, size of the investment, and financing of the investment. *Cf. Eurobond Exchange,* 13 F.3d at 1341 (investors left to promoter the elements essential to the success of the investment, including when to purchase the bonds and in what denominations, from what bank to obtain the funding at what interest rate, what bonds to purchase, and when to effect exchanges). Thus, even as repleaded, the Adventure Cattle scheme is not a security within the meaning of the securities laws, and the repleaded securities claims fail as futile. *Weimer,* 870 F.2d at 1407; *Dorn,* 767 F.2d at 444. Leave to file the second amended complaint is therefore denied as to the securities claims.

### 2. *Repleaded RICO claims*

In its prior ruling, the court determined that the parties agreed that the RICO enterprise was "Morken's enterprises," and the critical question was whether the defendants had "conducted" that RICO enterprise. *DeWit,* 879 F.Supp. at 968. The court concluded that defendants had not. *Id.* at 966. The proffered second amended complaint, however, shifts the essential inquiry from whether defendants conducted the enterprise, because they are now alleged to have been a part of the enterprise, to the question of whether what is alleged is properly a "RICO enterprise." The newly-defined "RICO enterprise" is alleged to be "an association-in-fact" of some of the bank defendants with Morken and SGLE, in one phase of its existence, and of the bank holding company and some of its constituent banks in a second phase. The alleged purposes of the two phases of the alleged RICO enterprise

also change from a scheme to penetrate the agricultural lending market, in the first phase, to minimizing the damage to the banks from the failure of the first scheme, in the second phase.

#### a. *A proper RICO enterprise*

 Plaintiffs assert that there is nothing new about allegations that a bank holding company and its banks could be part of a RICO enterprise. They also argue that the shifting purposes and shifting personnel of the two phases of the alleged enterprise are not fatal, because only "some continuity" to the enterprise is required. Defendants, to the contrary, argue that such shifting personnel and purposes are fatal to the alleged enterprise. Defendants also argue the doubtfulness of the shared purpose between the banks and Morken in the first phase of the alleged enterprise, because Morken was unlikely to be interested in penetrating the agricultural lending market. Furthermore, they argue that a RICO association-in-fact enterprise cannot consist of a parent corporation and its subsidiaries, as is alleged to be the case in the second phase of the enterprise, because of the identity of purpose of such parent and subsidiaries. Thus, they argue, there is no enterprise distinct from the "RICO person" in the second phase alleged to have conducted the enterprise.

*i. Association-in-fact enterprises.* An "enterprise" is defined by RICO to include

> any individual, partnership, corporation, association, or other legal entity, and *any union or group of individuals associated in fact although not a legal entity* [.]

18 U.S.C. § 1961(4). Thus, "[t]he RICO Act encompasses two kinds of enterprises: legal entities, and 'associations in fact.' " *Bennett v. Berg,* 685 F.2d 1053, 1060 n. 9 (8th Cir. 1982) (citing *United States v. Turkette,* 452 U.S. 576, 581–82, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981)); *United States v. Snider,* 720 F.2d 985, 988 n. 2 (8th Cir.1983) (under § 1961(4) of RICO, two kinds of enterprises are defined, the second of which is an "association in fact," citing *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74

L.Ed.2d 960 (1983)); *see also Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir.1995) ("There are, therefore, two types of [RICO] enterprises [under § 1961(4) ]: legal entities and associations-in-fact," citing *Turkette* ); *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir.1995) (two kinds of entities under § 1961(4)); *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir.1995) ("A RICO enterprise can be either a legal entity or an association-in-fact.");[28] *Aetna Cas. & Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1557 (1st Cir.1994) (distinguishing between "legal entity" enterprise and "association-in-fact" enterprise); *United States v. Blandford*, 33 F.3d 685, 703 (6th Cir.1994) ("Under § 1961(4), 'associations in fact' also are deemed enterprises."), *cert. denied*, —— U.S. ——, 115 S.Ct. 1821, 131 L.Ed.2d 743 (1995). Whichever form of enterprise is alleged, the plaintiff must show both an "enterprise" and a "pattern of racketeering activity." *Turkette*, 452 U.S. at 580–81, 101 S.Ct. at 2527–28; *Libertad*, 53 F.3d at 441; *Blandford*, 33 F.3d at 702–03; *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir.1993).

▮ In *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986 (8th Cir.1989), the Eighth Circuit Court of Appeals required proof of the same characteristics of a RICO enterprise defined as an association in fact as it had previously required for proof of a RICO enterprise defined as a single legal entity. *Atlas Pile Driving*, 886 F.2d at 995. Those characteristics were the following: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering. *Id.; see also United States v. Nabors*, 45 F.3d 238, 240 (8th Cir.1995) (quoting *Atlas Pile Driving Co.*, 886 F.2d at 995, for these characteristics); *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770–71 (8th Cir.1992) (also quoting *Atlas Pile Driving Co.); and see further Libertad*, 53 F.3d at 441 (requiring showing of same three characteristics for association-in-fact enterprise); *Crowe*, 43 F.3d at 205 (same characteristics for association-in-fact enterprise); *and compare United States v. Console*, 13 F.3d 641, 651–52 (3d Cir.1993) (describing the three elements that must be proved to show an association-in-fact as: (1) "an 'ongoing organization' "; (2) "proof 'that the various associates function as a continuing unit' "; and (3) "an 'entity separate and apart from the pattern of activity in which it engages,' " quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529), *cert. denied sub nom. Curcio v. United States*, —— U.S. ——, 114 S.Ct. 1660, 128 L.Ed.2d 377 (1994).

▮ The Eighth Circuit Court of Appeals has noted that "[a]n enterprise is particularly likely to be found where ... the enterprise alleged is a legal entity rather than an 'associational enterprise.' Legal entities are garden-variety 'enterprises' which generally pose no problem of separateness from the predicate acts." *Bennett*, 685 F.2d at 1060 (citing cases). However, where an association-in-fact entity is alleged, the Supreme Court has said that the enterprise may be

---

**28.** Because the court dismissed the previous version of plaintiffs' RICO claim pursuant to *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), having concluded that the defendants had only been alleged to have provided services to Morken's RICO enterprise, it is pertinent to note, as did the Third Circuit Court of Appeals, the possibility of redefining the enterprise to save RICO claims:

Commentators have observed that the plaintiffs in *Reves* could possibly have satisfied the operation and management requirement of § 1962(c) had they alleged the existence of another enterprise.

In *Reves* the enterprise was the Co-op, but this is not the only possibility. Section 1961(4) defines enterprise as including any "legal entity" ... and "any union or group of individuals associated in fact although not a legal entity." ... Thus, RICO's enterprise requirement can be satisfied by "a group of individuals associated in fact" even though not a distinct "legal entity." What if the plaintiff in *Reves* had alleged that an association in fact consisting of Arthur Young, Jack White [the Co-op's General Manager], and the Co-op constituted the racketeering enterprise, and that Arthur Young directed the affairs of this "enterprise?"

*See* Daniel B. Fischel & Alan O. Sykes, *Civil RICO after Reves: An Economic Commentary*, 1993 SUP.CT.REV. 193–94 (footnote omitted). *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 266 n. 5 (3d Cir.1995). Perhaps plaintiffs here have taken this leaf from the Third Circuit's, or more properly, Fischel's and Sykes's, book by repleading the RICO enterprise in the manner now presented. In any event, this court must now answer the question posed by the Third Circuit and Messrs. Fischel and Sykes.

shown "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528; *Libertad,* 53 F.3d at 442 (describing the requirement as alleging facts that the constituent entities or persons constituted and operated as part of an association-in-fact enterprise); *Crowe,* 43 F.3d at 205 (citing this standard from *Turkette* ); *Aetna Cas. & Surety,* 43 F.3d at 1557 (citing the *Turkette* standard); *Console,* 13 F.3d at 651–52 (citing *Turkette* ); *Frank v. D'Ambrosi,* 4 F.3d 1378, 1386 (6th Cir.1993) (citing *Turkette* ).

> In other words, [plaintiffs] must show the existence of the enterprise, of which [defendants] were a part. As a matter of law, it is not sufficient that several organized, ongoing groups come together for one concerted action, unless those groups can also be shown to constitute a larger unit, over and above their separate structures and operations, and that this unit meets the *Turkette* criteria for an "association-in-fact."

*Libertad,* 53 F.3d at 442. In *Libertad,* the First Circuit Court of Appeals found sufficient allegations of an association in an "affiliation" of Rescue America and other anti-abortion groups through shared information, joint planning, and the presence of the same people as leaders or organizers of each group, suggesting that they functioned as a continuing unit. *Id.* at 443. By contrast, in *Richmond,* the Seventh Circuit Court of Appeals found that the plaintiff had alleged only structure, continuity, and common course of conduct with respect to two named defendants individually, but not with respect to the enterprise, and there were no allegations of a relationship among the allegedly constituent entities of the enterprise. *Richmond,* 52 F.3d at 645–46. The Seventh Circuit Court of Appeals therefore found the failure to allege the association of the entities in the complaint, even in light of elaborate allegations of a relationship among them in briefs, required dismissal of the complaint. *Id.* at 646. Similarly, in *Frank,* the Sixth Circuit Court of Appeals found that a complaint that "ha[d] not even cogently alleged *any* activity that would show ongoing, coordinated behav-ior among the defendants that would constitute an association-in-fact" was properly dismissed. *Frank,* 4 F.3d at 1386.

In *Console,* the Third Circuit Court of Appeals parsed out from *Turkette* a three-prong test for an association-in-fact enterprise as requiring the plaintiff to prove: (1) "an 'ongoing organization' "; (2) "proof 'that the various associates function as a continuing unit' "; and (3) "an 'entity separate and apart from the pattern of activity in which it engages.' " *Console,* 13 F.3d at 651–52 (quoting *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528). The court observed that the first element requires the plaintiff to show "some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual. There must be some mechanism for controlling and directing the affairs of the group for the group on an ongoing, rather than an ad hoc, basis." *Id.* at 651. The second element required the plaintiff to show " 'that each person perform[ed] a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization.' " *Id.* (quoting *U.S. v. Riccobene,* 709 F.2d 214, 223). As to the third element, the court stated that "[a]s we understand this last requirement, it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement." *Id.* at 651–52 (citing *Riccobene,* 709 F.2d at 223–24). Thus, the court held in the case before it that this requirement had been met where the associates "coordinated the commission of multiple predicate offense, ... and continued to provide legitimate services during the period in which they were engaged in racketeering activities." *Id.* at 652.

In *Atlas Pile Driving,* the Eighth Circuit Court of Appeals held that an association in fact may include corporations, citing prior

decisions from other circuits. *Atlas Pile Driving,* 886 F.2d at 995 n. 7 (citing *United States v. Perholtz,* 842 F.2d 343, 353 (D.C.Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988)); *see also United States v. Feldman,* 853 F.2d 648, 655 (9th Cir.1988), *cert. denied,* 489 U.S. 1030, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989) (holding that a RICO enterprise may consist of individuals associated in fact with corporations); *Console,* 13 F.3d at 652 (association in fact may be association of legal entities, or composed of legal as well as non-legal entities). The Supreme Court has held that the enterprise need not be a profit-seeking entity or a victim of unlawful activities. *National Organization for Women, Inc. v. Scheidler,* — U.S. ——, ——, 114 S.Ct. 798, 804, 127 L.Ed.2d 99 (1994); *Libertad,* 53 F.3d at 441. Rather, it may be the "vehicle" through which the unlawful pattern of racketeering is committed. *Id.; Libertad,* 53 F.3d at 441–42; *Jaguar Cars,* 46 F.3d at 266.

▬ However, the Eighth Circuit Court of Appeals also held in *Atlas Pile Driving* that the "person" named as the defendant cannot also be the entity identified as the enterprise. *Id.* at 995; *see also Libertad,* 53 F.3d at 442 ("the same entity cannot do "double duty" as both the RICO defendant and the RICO enterprise," citing *Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 44–45 (1st Cir.1991), but omitting cases cited therein); *Jaguar Cars,* 46 F.3d at 268 ("§ 1962(c) liability requires conduct by defendant 'persons' acting through an 'enterprise,' and the person must be 'distinct' from the enterprise"); *Crowe,* 43 F.3d at 205 ("the RICO person and the RICO enterprise must be distinct"). The court went on to explain as follows:

> Here, Atlas and Olson alleged that the enterprise was an association in fact consisting of DiCon, LMH, AES, Stroth, and CACC. Two members, DiCon and LMH, were also persons named as defendants. The appellants contend that, because DiCon and LMH were members of the enterprise, Atlas and Olson have failed to demonstrate that there exists a person distinct from the enterprise. We disagree.
>
> Here, the enterprise and the person are not identical, as the appellants assert. The enterprise in this case is an association in fact composed of five entities. A collective entity is something more than the members of which it is comprised. If five persons form an association in fact and engage in a pattern of racketeering activity such as drug smuggling and murder, an individual member could never be prosecuted for violating RICO under the appellants' reasoning because he or she would not be considered distinct from the enterprise. We do not believe that Congress envisioned that this type of conduct would be insulated from RICO prosecutions. Other courts confronted with this issue have reached identical results. *See, e.g., Perholtz,* 842 F.2d at 353–54; *Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1287–88 (S.D.N.Y.1988); *Connors v. Lexington Ins. Co.,* 666 F.Supp. 434, 447–48 (E.D.N.Y.1987).
>
> Thus, we find that Atlas and Olson have demonstrated that LMH and DiCon were distinct from the enterprise.

*Atlas Pile Driving,* 886 F.2d at 995. Similarly, the requirement has been described by other courts to be that "[t]he person or persons alleged to be engaged in racketeering activity must be entities distinct from the enterprise." *Libertad,* 53 F.3d at 442; *Odishelidze v. Aetna Life & Cas. Co.,* 853 F.2d 21, 23 (1st Cir.1988) (per curiam). Or, to put it yet another way, "because the racketeer and the enterprise must be distinct, *Miranda [v. Ponce Fed. Bank],* 948 F.2d [41,] 45 [ (1st Cir.1991) ], the enterprise must be an entity separate from the named defendants who are allegedly engaging in unlawful activity." *Libertad,* 53 F.3d at 442; *see also Davis v. Mutual Life Ins. Co. of New York,* 6 F.3d 367, 377 (6th Cir.1993) ("[F]or the purposes of section 1962(c), a corporation cannot be both the 'enterprise' and the 'person' conducting or participating in the affairs of that enterprise," describing this as the "non-identity" or "distinctness" requirement.), *cert. denied,* — U.S. ——, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994).

▬ As to plaintiffs' new claim of conspiracy pursuant to § 1962 and its relationship to a claimed association-in-fact enter-

prise, the Eighth Circuit Court of Appeals has held that

> an individual's participation in an association in fact will not necessarily establish his membership in a conspiracy.... [I]n order to prove that an individual joined a conspiracy to violate RICO under section 1962(d), the government must establish that the individual "objectively manifested an agreement to participate directly, or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." [*United States v.*] *Philips* [*Phillips*], 664 F.2d [971,] 1012 [ (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).] It is true that where the enterprise is defined as an association in fact, proof of that enterprise may prove an unlawful agreement. *United States v. Pungitore,* 910 F.2d 1084, 1114 (3rd Cir.1990), *cert. denied,* 500 U.S. 915, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991).

*United States v. Bennett,* 44 F.3d 1364, 1372 (8th Cir.), *cert. denied,* ─── U.S. ───, 115 S.Ct. 2279, 132 L.Ed.2d 282 (1995). Thus, if plaintiffs have sufficiently alleged an association-in-fact RICO enterprise, their allegations of a RICO conspiracy by persons involved in that enterprise is sufficient to sustain the conspiracy claim over objections that it is futile.

***ii. Enterprises consisting of parents and subsidiaries.*** Defendants challenge the sufficiency of the repleaded RICO enterprise, at least in its "second phase," as consisting only of a corporation and its subsidiaries, and therefore not an association at all, but a single entity. Defendants argue that none of the RICO defendants in this second phase is distinct from the enterprise, and therefore no RICO claim has been stated.

The Sixth Circuit Court of Appeals has directly confronted the question of whether the proper "distinctness" of the RICO person and the RICO enterprise exists when the enterprise is defined as consisting of a corporation and its subdivisions and the corporation is then asserted to be the RICO person:

> Under the "non-identity" or "distinctness" requirement, a corporation may not be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members. An organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself. *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983).

*Davis,* 6 F.3d at 377. The court found that in the case before it, however, what defendants argued was only one of its subdivisions, an association of its agents, was in fact an entirely separate entity. *Id.*

Similarly, the First Circuit Court of Appeals examined the "distinctness" requirement as it pertained to a corporation and its subsidiaries in *Compagnie de Reassurance D'Ile de France v. New England Reinsurance Corp.,* 57 F.3d 56, 92 (1st Cir.1995). The court's discussion of this point deserves quotation in its entirety:

> As to the § 1962(c) claim, the district court stated that "the three Defendants were [not] separate persons." In fact, however, NERCO, First State, and Cameron & Colby were distinct corporate entities, with separate legal identities. The distinction between those three entities is not, however, decisive for § 1962(c) purposes. The statute requires that the *person* (i.e., the three defendants) engaged in racketeering be distinct from the *enterprise* (in this case, Graham Watson, not a defendant) whose activities he or she seeks to conduct through racketeering. *See, e.g., Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44–45 (1st Cir.1991) (citing cases) ("the same entity cannot do double duty as both the RICO defendant and the RICO enterprise"). Assuming the court meant to find that NERCO, First State, and Cameron & Colby were not distinct from Graham Watson, it was clearly entitled, on the evidence presented, to make such a finding. Up until mid–1980, Graham Watson was merely an unincorporated division of Cameron & Colby. After that time, although it became a wholly-owned subsidiary corporation, all of its employees were in fact Cameron & Colby employees, and there is no

evidence whatsoever that Graham Watson took any actions independent of its parent. *Cf. Brittingham v. Mobil Corp.,* 943 F.2d 297, 302–303 (3d Cir.1991) (noting that § 1962(c) claims may be dismissed "when the enterprise and defendant, although facially distinct, are in reality no different from each other"). We accordingly affirm the district court's dismissal of the plaintiffs' RICO claims.

*Compagnie de Reassurance,* 57 F.3d at 92.

Although it had held in a series of cases that the distinctness requirement is not met where the enterprise and RICO defendants are corporations and their subsidiaries, the Third Circuit Court of Appeals recently reiterated that it is the specific factual relationship among the entities, rather than simply their legal relationship, that is determinative. *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1411–13 (3d Cir.1993). The court's inquiry began with what it called the *"Enright* rule," based on its decision in *B.F. Hirsch v. Enright Refining Co.,* 751 F.2d 628, 633 (3d Cir.1984), that the defendant "person" charged with violating § 1962(c) cannot be the same entity that is alleged to be the "enterprise." *Lorenz,* 1 F.3d at 1411. The court noted that it had expanded this rule in *Brittingham v. Mobil Corp.,* 943 F.2d 297 (3d Cir.1991), reasoning "that *Enright's* requirement of distinctiveness would be eviscerated if a plaintiff could successfully plead that an enterprise consists of a defendant corporation associated with the employees, agents, and affiliated entities acting on its behalf." *Lorenz,* 1 F.3d at 1411. The court quoted its conclusion in *Brittingham,* that

> [w]ithout additional allegations, therefore, a subsidiary corporation cannot constitute the enterprise through which a defendant parent corporation conducts a racketeering enterprise. . . . [C]laims will be dismissed when the enterprise and defendant, although facially distinct, are in reality no different from each other.

*Lorenz,* 1 F.3d at 1411 (quoting *Brittingham,* 943 F.2d at 302). This is the same "in reality no different from each other" rule applied by the First Circuit Court of Appeals, which also quoted *Brittingham,* in *Compagnie de Reassurance.* The *Lorenz* court then noted that it had followed *Brittingham* in *Glessner v. Kenny,* 952 F.2d 702 (3d Cir.1991), to dismiss under Rule 12(b)(6) a claim pursuant to § 1962(c) alleging a parent corporation as the RICO defendant and its subsidiary as the enterprise. *Id.* at 1412.93156387 The court concluded that even after *Brittingham* and *Glessner* it was still theoretically possible for a corporation to be the defendant and its subsidiary to be the enterprise, but that the plaintiff must plead facts which, if assumed to be true, would clearly show that the parent corporation played a role in the racketeering activity which is distinct from the activities of its subsidiary. *Id.* The court concluded that the plaintiff before it in *Lorenz* had failed to meet this requirement, because as pleaded the corporate parent was not distinct from the subsidiary alleged to be the RICO enterprise. *Id.* at 1413.

***iii. The enterprise alleged here.*** There can be no doubt, in light of the foregoing cases, that plaintiffs may properly allege a RICO enterprise that is an "association in fact" rather than a legal entity, 18 U.S.C. § 1961(4); *Bennett,* 685 F.2d at 1060 n. 9 (citing *Turkette,* 452 U.S. at 581–82, 101 S.Ct. at 2527–28), or that such an association in fact may consist of both corporations and individuals or other kinds of entities. *Atlas Pile Driving,* 886 F.2d at 995 n. 7; *see also Console,* 13 F.3d at 652; *Feldman,* 853 F.2d at 655.

Plaintiffs must therefore show that they have alleged an association-in-fact enterprise that is otherwise proper and a "pattern of racketeering activity." *Turkette,* 452 U.S. at 580–81, 101 S.Ct. at 2527–28; *Libertad,* 53 F.3d at 441; *Blandford,* 33 F.3d at 702–03; *Frank,* 4 F.3d at 1386. The first question will be answered in terms of the three-part inquiry for an enterprise described in *Atlas Pile Driving,* 886 F.2d at 995 ((1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering), then in terms of the overlapping *Turkette* test for an association in fact, as that test has been elucidated by the Third Circuit Court of Appeals in *Console,* 13 F.3d at 651–52 ((1) "an 'ongoing organization'"; (2) "proof 'that the various

associates function as a continuing unit'"; and (3) "an 'entity separate and apart from the pattern of activity in which it engages,'" quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2529).

Defendants' challenge to the repleaded RICO enterprise in its entirety is that it completely changes its purpose at the same time that key members, Morken and SGLE, departed from the enterprise. Thus, defendants argue, there is not one enterprise with continuity of personnel and purpose, but, perhaps, two distinct enterprises. Defendants then argue that each enterprise, which the court has described as the "first phase," in existence before June 2, 1992, and a "second phase" thereafter, are each inadequate. Defendants attack the definition of the enterprises in the "first phase" as lacking a common purpose and common control. They attack the definition of the enterprise in its "second phase" as lacking a defendant distinct from the enterprise, because the enterprise as alleged consists only of a parent corporation and its subsidiaries, in reality a single entity, and therefore no RICO defendant is distinct from the enterprise.

■ Defendants' first objection is well-taken, but not determinative. Although the law of this circuit requires only "'some continuity ... of personnel,'" rather than "'complete continuity,'" *Atlas Pile Driving*, 886 F.2d at 995, so that the expulsion of Morken and SGLE from the enterprise is not fatal, the simultaneous change in the purpose of the enterprise destroys the continuity of the enterprise. Thus, defendants correctly assert that the two phases of the enterprise cannot be construed as a single RICO enterprise. However, the court concludes that the practical effect of its conclusion that there is not one RICO enterprise alleged in the second amended complaint, but two, each defined by different personnel and different shared purposes, is not that the RICO claims must be dismissed for failure to allege a proper RICO enterprise, but that the court must consider the adequacy of the pleading of the RICO enterprise alleged in each phase. If either RICO enterprise is proper, the RICO claims also founded on predicate acts *in furtherance of that enterprise's purpose* will survive. The court will therefore consider, as plaintiffs appear to invite the court to do, the adequacy of the allegations concerning each phase of the alleged enterprise as to whether it is a proper RICO enterprise.

■ Thus, the court turns to defendants' challenge to the first-phase enterprise as lacking a common purpose. The "common purpose" of the first-phase enterprise plaintiffs allege in the second amended complaint was "to penetrate the agricultural lending market, expand participation in that market, and to derive substantial and increasing fee income through a direct association with Morken and SGLE." Second Amended Complaint, ¶ 68. Defendants doubt that Morken and SGLE shared this purpose with the other members of the enterprise, which can reasonably be inferred to be a purpose only of the Firstar defendants. The court agrees. Nor does the court find that the enterprise, including Morken and SGLE, can be construed as merely being the "vehicle" for the plan,[29] because the question is whether the *enterprise* can be defined by a shared purpose. *Atlas Pile Driving*, 886 F.2d at 995. The purpose of this first-phase enterprise is described differently in the plaintiffs' brief, where the purpose of the first-phase enterprise was described as "to extract huge fees for all of the members of the enterprise from highly leveraged transactions based on speculation in the cattle market." Plaintiffs' Memorandum in Opposition to Defendants' Motion to Strike, p. 8. Neither of these formulations of the purpose, however, can be reasonably inferred to have been shared by all of the members of the enterprise as alleged. However, plaintiffs also cite as demonstrating a shared purpose similar to their own a scheme in which a bank and bank employees associated with another in a RICO association-in-fact enterprise with the purpose of facilitating another's fraudulent

---

29. The court acknowledges that Morken and SGLE might be the vehicle of such a purpose, if Morken and SGLE were still the enterprise, *Scheidler*, —— U.S. ——, ——, 114 S.Ct. 798, 804 (1994); *Libertad*, 53 F.3d at 441, but that construction failed in the first amended complaint, because the defendants were held not to have "conducted" Morken's enterprises.

scheme, with consequent benefits to all participants. *Id.* (citing *Grunwald v. Bornfreund,* 668 F.Supp. 128, 132–33 (E.D.N.Y. 1987)). Construing the second amended complaint perhaps more liberally than its drafting deserves on a third attempt, the court believes that one could, from the facts alleged, reasonably infer such a common purpose here and that all that is lacking is a coherent articulation of that purpose in the complaint. *Carney,* 33 F.3d at 894 (standards for construction of claim in light of asserted failure to state a claim); *Westcott,* 901 F.2d at 1488 (court accepts only reasonable inferences). If the RICO claims as realleged survive in other respects, therefore, the court will allow amendment to clarify this allegation of the common purpose of the first-phase enterprise.

Plaintiffs assert that the structure of the first-phase, and indeed, the second-phase enterprise is sufficient, based on the obvious structure and organization of the Firstar banks, and sufficiently distinct from the inherent predicate acts. Such an argument, however, misses the point that it is the RICO enterprise, not its constituent entities, that must display the requisite structure. *Richmond,* 52 F.3d at 645–46. However, again reading the facts as pleaded liberally, there was at least a consensual structure or hierarchy among the entities comprising the alleged enterprise to effect the purpose of facilitating a fraudulent scheme. *Console,* 13 F.3d at 651 (this court reads together *Console's,* first requirement, "some sort of structure exits within the group for the making of decisions, whether it be hierarchical or consensual," and second requirement, that enterprise continue as a unit, in which " 'each person perform[ed] a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization.' "). The workings of the controlled disbursement scheme as alleged, taken as true, certainly demonstrate an organization including each of the participants to effect the purposes of the alleged enterprise, and that this organization had sufficient continuity and some existence apart from the controlled disbursement scheme itself. The first-phase RICO enterprise, as alleged in the second amended complaint, is therefore sufficient if an adequate pattern of RICO activity has also been alleged.

■ The second-phase enterprise, however, is more problematical, consisting as it does solely of a corporation and its subsidiaries. However, the court must apply the "in reality no different from each other" test of *Lorenz,* 1 F.3d at 1411 (quoting *Brittingham,* 943 F.2d at 302), and *Compagnie de Reassurance,* 57 F.3d at 92, which the court concludes is essentially the same as the "entirely separate" test of *Davis,* 6 F.3d at 377, even if stated in converse terms. Plaintiffs rely on the legal distinctness of each of the Firstar entities, while defendants rely on a legal identity among them. Because the complaint raises reasonable inferences that plaintiffs' formulation is correct, based on the distinct roles alleged to have been played by each of the Firstar entities, and because of the court's inability to resolve a factual dispute based solely on the pleadings, the court cannot find the allegation of the second-phase entity futile as a matter of law. Like the first-phase enterprise, therefore, the viability of the RICO claims pertaining to this enterprise rise or fall on the viability of plaintiffs' allegations of a pattern of predicate activity.

#### b. *Pattern or racketeering*

As the court observed in its prior ruling, a " 'pattern of racketeering' has been described as 'the heart of any RICO complaint.' " *DeWit,* 879 F.Supp. at 968 (quoting *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 154, 107 S.Ct. 2759, 2766, 97 L.Ed.2d 121 (1987)). In its prior decision, the court found the allegations of a pattern of activity, based on undefined allegations of many predicate acts, was simply insufficient. *DeWit,* 879 F.Supp. at 969–75. However, the court's review of the second amended complaint indicates that plaintiffs have now alleged specific acts with sufficient specificity that, if proved, would sustain individual predicates sufficiently related to constitute a pattern of racketeering activity. *See, e.g., Diamonds Plus,* 960 F.2d at 769 (requirement is allegation of appropriate acts sufficiently related and posing threat of continued criminal activity). The allegations cure most of the

specific inadequacies identified by the court in its prior ruling, first by pleading each act with the requisite particularity, and thereby curing the fatal flaw in the previous allegations, which was the uncertainty about the relatedness of these acts, because the court could not determine whether or not the predicates " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *DeWit,* 879 F.Supp. at 970 (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985)). The court will point out below the manner in which the second amended complaint cures the flaws in the allegation of the predicate acts. That discussion necessarily demonstrates the relatedness of the alleged predicate acts, as does the new allegation in the second amended complaint, ¶ 72, which specifically articulates the relatedness of the acts and the common purpose towards which all are directed.

### c. Predicate acts

Like the first amended complaint, the predicate acts upon which the RICO claims depend in the second amended complaint include mail and wire fraud, securities fraud, common-law fraud, and bankruptcy fraud. Second Amended Complaint, ¶¶ 74–106. Because the court concluded above that the Adventure Cattle contracts are not securities, the allegations of predicate acts founded on securities fraud, Second Amended Complaint, ¶¶ 84–95, must be stricken and cannot be considered as supporting a "pattern" of RICO activity. However, the remaining allegations of predicate acts are sufficient.

■ *i. Mail, wire, and common-law fraud.* In assessing the repleaded predicate acts of mail and wire fraud, upon which the RICO allegations here largely depend, the court is particularly mindful of a decision of the Eighth Circuit Court of Appeals handed down only the day before the court's prior ruling. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.,* 48 F.3d 1066 (8th Cir.1995). In *Murr Plumbing,* the court held that allegations of wire and mail fraud require not use of the mails or wires in making misrepresentations of fact, but simply use of the mails or wires in furtherance of a fraudulent scheme. *Murr Plumbing,* 48 F.3d at 1069 & n. 6. The second amended complaint alleges with sufficient particularity that there was a pattern of use of the mails and wires in furtherance of the allegedly fraudulent scheme. *Id.*

■ In its prior decisions, the court found that the claims of wire and mail fraud, and the deficiencies in those allegations, were "startlingly similar" to those in *Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir.1994), in that the claim made only general identification of the nature of the purported misrepresentations, and allegation of "multiple instances" of use of the wires and mails to contact customers, but with a failure to identify which plaintiffs or other parties were contacted when or who was defrauded in what way. *DeWit,* 879 F.Supp. at 973. The court also found that there was insufficient allegation in the second mail or wire fraud allegation of the time, place, and content of the communications allegedly furthering this alleged fraud. *Id.; see also Murr Plumbing,* 48 F.3d at 1069 (reiterating the necessity of pleading these "circumstances" of fraud pursuant to Rule 9(b) when alleging mail and wire fraud). The court opined that these deficiencies might be cured by repleading, but dismissed the complaint having found other apparently insurmountable flaws in the pleadings. *Id.*

By contrast, the mail and wire fraud allegations of the second amended complaint identify with particularity the actors in the fraudulent schemes as Firstar Milwaukee, Firstar Wausau, Vinent, and Buscemi, Second Amended Complaint, ¶¶ 74–76, the nature of the fraud, as disguising the nature of the banking transactions and Morken's qualification for the purportedly legitimate banking services supplied, *Id.* at ¶¶ 77–79, and the time, place, and manner of the fraud. *Id.* at ¶¶ 80–83. Similar particularity as to time, place, manner, content, and identity of actors and victims is apparent in the renewed allegations of common-law and wire or mail fraud in the allegedly fraudulent shut-down of the controlled disbursement scheme. *See, e.g., id.* ¶¶ at 97–103. The plaintiffs have

successfully alleged mail and wire communications in furtherance of an alleged fraud, even if the content of those communications did not include misrepresentations. *Murr Plumbing,* 48 F.3d at 1069 & n. 6.

■ **ii. Bankruptcy fraud.** The court noted that the first amended complaint pleaded with specificity the maker of the statements, to whom they were made, and the respect in which they were fraudulent, but found that the allegations pleaded only conclusory allegations of the Firstar defendants' knowledge of the fraudulent nature of the filings in the bankruptcy proceedings, and further, that this lone allegation of a predicate act, which could possibly be salvaged by discovery and repleading, did not constitute a pattern of racketeering activity. *DeWit,* 879 F.Supp. at 975. The repleaded allegations retain the good points of the prior pleading of bankruptcy fraud, but add to them new allegations of the basis for specific Firstar defendants to "know" that the filings were fraudulent. *See, e.g.,* Second Amended Complaint, ¶¶ 104–105. This allegation of bankruptcy fraud is also properly alleged to be related to other predicate acts of mail and wire fraud in termination of the controlled disbursement scheme all in aid of the purpose of making investors the victims of the collapse of Morken's financial empire rather than his bankers. Viable allegations of predicate acts and their relatedness are therefore present in the second amended complaint where they were absent from the first amended complaint. The RICO claims of the second amended complaint are therefore not futile and do not bar the filing of the second amended complaint. *Weimer,* 870 F.2d at 1407; *Dorn,* 767 F.2d at 444.

### 3. Summary of disposition of the motion for leave to amend

The court concludes that the RICO claims, as realleged, are not so futile as to bar their filing in an amended complaint following dismissal of the first amended complaint for failure to state a claim upon which relief can be granted. The court will therefore grant plaintiffs' motion for leave to file the proffered second amended complaint. The court will grant plaintiffs an appropriate period to amend the alleged purpose of the first-phase RICO enterprise in order to conform the pleading to the purpose of that enterprise as alleged in plaintiffs' brief. However, the claims in the second amended complaint alleging violation of securities laws are dismissed as futile. Furthermore, the allegations of RICO predicate acts founded on alleged securities law violations are also stricken. The court, having given plaintiffs yet another bite at the apple, will not allow a further amendment to attempt to state securities law claims against these defendants.

The court will therefore grant the parties one hundred and twenty days within which to pursue discovery on the RICO and common-law claims contained in the second amended complaint.

### C. Interlocutory Appeal

The court, not unmindful of the complexity and closeness of the issues involved in this decision, and concerned that this litigation proceed in the most efficient manner finds this case appropriate for immediate appeal in its entirety pursuant to 28 U.S.C. § 1292(b). That statute provides, in pertinent part, as follows:

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b). As the Eighth Circuit Court of Appeals has observed, the statute provides for certification of controlling questions of law by the district court for interloc-

utory appeal in circumstances where an appeal is otherwise unavailable. *City of Fort Madison, Iowa v. Emerald Lady,* 990 F.2d 1086, 1088 n. 4 (8th Cir.1993). However, the appellate court must, upon certification, decide in its discretion, whether to permit the appeal on the question certified. *Id.*

Because § 1292(b) provides for appeal of orders otherwise unappealable, and thus provides an avenue for resolving disputed and controlling questions of law, the resolution of which will materially further the litigation, the appellate court reviews *de novo* the questions of law certified by the district court. *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 400 (8th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987).[30] The nature and scope of the appellate court's review is not rigidly determined by the certified questions, however. *Id.* (citing *In re Oil Spill by the Amoco Cadiz,* 659 F.2d 789, 793 n. 5 (7th Cir.1981)). The appellate court

remain[s] free to consider " ' "such questions as are basic to and underlie" ' " the questions certified by the district court. [*In re Oil Spill by the Amoco Cadiz,* 659 F.2d at 793 n. 5] (quoting *Helene Curtis Indus., Inc. v. Church & Dwight Co.,* 560 F.2d 1325, 1335 (7th Cir.1977) (quoting 9 J. Moore, *Moore's Federal Practice* ¶ 110.25[1], at 270)); *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 962 n. 7 (3d Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

*Simon,* 816 F.2d at 400.

In a recent decision, the Eighth Circuit Court of Appeals consider the standards applicable to an interlocutory appeal pursuant to § 1292(b). *See White v. Nix,* 43 F.3d 374 (8th Cir.1995). The court held that "[t]he requirements of § 1292(b) are jurisdictional," and the statute should be used with

care to avoid piece-meal appeals. *Id.* at 376. Thus, the court stated that § 1292(b) " 'should and will be used only in exceptional cases where a decision on appeal may avoid protracted and expensive litigation, as in antitrust and similar protracted cases.' " *Id.* (quoting S.Rep. No. 2434, 85th Cong., 2d Sess. (1958), reprinted in 1958 U.S.C.C.A.N. 5255, 5260). Thus, the statute should be used "sparingly" and the burden, on the movant, is a heavy one to show that the case is an "exceptional" one in which immediate appeal is warranted.[31] *Id.* Nonetheless, the court's grant of interlocutory appeal is reviewed for abuse of discretion. *Id.* (finding abuse of discretion in that case in failure to consider whether the appeal involved a controlling question of law.). The court therefore reiterated that § 1292(b) establishes three criteria that must be met for certification by the court: "the district court must be 'of the opinion that' (1) the order 'involves a controlling question of law'; (2) 'there is substantial ground for difference of opinion'; and (3) certification will 'materially advance the ultimate termination of the litigation.' " *Id.* at 377.

This court is of the opinion that this order involves controlling questions of law, in the first instance, as to the viability of the plaintiffs' securities law claims. The court has dismissed the plaintiffs' securities law claims on its conclusion, as a matter of law, that the Adventure Cattle contracts are not securities. The securities determination is interwoven to the remaining RICO claims, because violations of the securities laws were also alleged as predicate acts for the RICO claims. Thus, an error on this controlling question of law could produce an incorrect conclusion not only on the dismissal of the securities claims, but on essential aspects of the claims the court has allowed to go forward. Next, the court finds that there is substantial ground for difference of opinion, owing to the frequency with which courts

---

**30.** Where the certified questions embody both factual and legal considerations, the appellate court "endeavor[s]" to give deference to the district court's factual determinations. *Simon,* 816 F.2d at 400.

**31.** No party here has moved for certification of interlocutory appeal. Nonetheless, this court, reading the plain language of the statute, believes that if it "shall be of the opinion that such order" meets the criteria of the statute, it may certify the matter for interlocutory appeal *sua sponte.*

have held similar, but not identical, cattle feeding investment schemes to be securities, contrary to this court's conclusion. Finally, interlocutory appeal will materially advance the ultimate termination of this litigation, because it would ensure that this involved, multiparty litigation goes to trial the first time on all viable claims, rather than presenting the courts and the parties with the possibility of ultimate reversal on the securities issues requiring retrial not only of those claims, but materially impacting the first trial of the RICO claims which could have been founded on securities fraud predicate acts in the first trial.

As to the RICO claims, the parties have strenuously argued the viability of these claims as well. The court's determination that the second amended complaint states controlling questions of law, because it is the only remaining federal question upon which this court's jurisdiction is founded, and because the court has concluded, as a matter of law, that the RICO claims are not futile as repleaded. There is substantial ground for difference of opinion as to whether the first-phase enterprise presents a shared purpose, whether the second-phase enterprise as pleaded falls within the ambit of the "in reality no different" test or is deficient as a matter of law, and whether the two phases of the enterprise as pleaded are separable or otherwise inadequate. The court also believes that there is some ground for a difference of opinion as to the adequacy of the pleading of a pattern of racketeering activity. For much the same reason as was stated above for interlocutory appeal of the securities ruling, the court believes that interlocutory appeal of the RICO determinations will materially advance the ultimate termination of this litigation.

As a final matter, this court is of the opinion that the complexity of the claims and issues presented here, the extensive discovery and huge amount of the documentary evidence involved, suggest that this case is one of those "exceptional cases" involving the prospect of expensive and protracted litigation for which sparing use of § 1292(b) is particularly appropriate in order to move this matter more rapidly to a just and proper conclusion. *White,* 43 F.3d at 376. In the event one or both of the parties file the necessary application for appeal within ten days of the date of this order as required by the statute, the court urges the Eighth Circuit Court of Appeals to exercise its discretion to accept interlocutory appeal of this decision pursuant to 28 U.S.C. § 1292(b).

### III. CONCLUSION

The court has been confronted here with both a motion to reconsider its prior ruling dismissing this matter in its entirety for failure to state a claim upon which relief can be granted and an alternative motion to allow filing of an amended complaint which attempts to cure the deficiencies found by the court in the dismissed complaint. Although the court has found no ground for setting aside its prior ruling, it nonetheless concludes that it should allow the filing of the second amended complaint, albeit not in its entirety. As with its prior ruling in this matter, the court believes that everyone concerned would benefit from a summary of the court's conclusions concerning the difficult issues presented.

The court was first confronted with the problem that the plaintiffs' motion "for reconsideration" did not identify the legal authority upon which it was founded. The court finds that such motions are most often brought pursuant to either *Fed.R.Civ.P.* 59(e) or *Fed.R.Civ.P.* 60(b). The court concludes, in the first instance, that plaintiffs' motion should be treated as one pursuant to Rule 59(e), because it was filed within ten days of the ruling plaintiffs seek to alter or amend, but the court has examined the issues offered for reconsideration pursuant to both Rule 59(e) and Rule 60(b).

Next, the court rejects plaintiffs' assertion that the court improperly disregarded controlling precedent that purportedly held that, in this circuit, only vertical commonality, not horizontal commonality, is required for an investment to be a "security" subject to federal securities laws. The purported precedent does not stand for the proposition for which plaintiffs have cited it. Furthermore, even if the precedent could be construed to stand for the proposition for which plaintiffs

cited it, the precedent is irrelevant to the court's prior determination that the Adventure Cattle contracts in question here are not "securities," because the court also based that conclusion on a lack of vertical commonality, lack of expectation of profits, and lack of reliance solely on the efforts of others, all requirements of a "security" under the Supreme Court's test articulated in the *Howey* decision. Plaintiffs did not challenge any of these other determinations in the motion for reconsideration. Thus there is neither a "manifest error of law" nor "exceptional circumstances" requiring the court to alter or amend its prior judgment of dismissal concerning the securities law claims in the first amended complaint.

The court was also asked to reconsider its failure to grant leave to file an amended complaint as a matter of course upon dismissal of the first amended complaint for failure to state a claim upon which relief can be granted. However, the court concludes that there is no right, nor even any common practice, of granting leave to amend upon dismissal of a complaint for failure to state a claim. The applicable standards provides that the party seeking leave to amend after dismissal must first obtain relief from the judgment to allow such amendment and then present the court with a nonfutile amended complaint, i.e., one that would withstand a motion to dismiss for failure to state a claim upon which relief can be granted. Although there was no "manifest legal error" permitting alteration of the court's prior order to permit such an amendment pursuant to Rule 59(e), "exceptional circumstances" can be found in the lack of opportunity to appeal disposition of a second amended complaint, coupled with the plaintiffs' apparent willingness to abandon the first amended complaint making appeal of dismissal of that complaint an exercise in futility, the possibility of providing for such amendment pursuant to Rule 60(b) identified in precedent of this circuit, and the interests of justice and economy for the parties, the district court, and the court of appeals, all of which weigh in favor of the court's consideration of the proffered second amended complaint. The court therefore denies defendants' motion to strike the proffered second amended complaint, but will permit filing of only such portions of the second amended complaint as are not futile.

Turning to the adequacy or futility of the proffered second amended complaint, although the second amended complaint incorporates the language of applicable standards for a cause of action under the securities laws, it still does not thereby present a nonfutile claim of violation of the securities laws. The court, not bound to treat as true either plaintiffs' legal conclusions or unwarranted factual inferences, concludes that, even as repleaded, the Adventure Cattle contracts at issue are not securities. The Adventure Cattle investment scheme lacks horizontal commonality, because there is no sharing of the risks or profits, nor pooling of the investments among investors. Rather, under the *facts* as pleaded and taken to be true, each investors' investment was distinct and treated as such. Furthermore, the Adventure Cattle investment scheme lacks vertical commonality, i.e., commonality between the investors and the promoter, because the Adventure Cattle contracts specifically uncouple the promoter's efforts and fortunes from those of the investors by guaranteeing a specified return whatever the performance of the underlying cattle sales and by ensuring that return from the promoter's other enterprises. Thus, the promoter's fortunes enjoy possible upturns and downturns from which the investors are entirely insulated. The Adventure Cattle contracts lack an expectation of profits from the efforts of others, because the contracts provide a specified interest rate as a return, and because the investors made the only decisions that determined the net return on the investment. The securities claims must therefore be dismissed from any filing of the second amended complaint.

Turning to the RICO claims as realleged in the second amended complaint, the court concludes that plaintiffs have alleged not just one, but two, viable RICO enterprises as associations in fact. The first-phase enterprise is a viable allegation of an association in fact of the banking corporations, the promoter of the Adventure Cattle investment scheme, and the promoter's cattle brokerage firm. Plaintiffs have alleged a viable "com-

mon interest" of this enterprise, albeit only in their brief, of facilitating a fraudulent scheme. The court rejects defendants' assertion that the second-phase enterprise consists only of the RICO defendant, and therefore lacks the necessary "distinctness" of the RICO enterprise and RICO defendant, because it is composed of only a parent corporation and its subsidiaries. Under the "in reality no different" test, or "entirely separate" test, articulated by circuit courts of appeals, the fact question, which cannot be answered on the pleadings and therefore must be considered favorably to the plaintiffs here, is whether the subsidiaries were entirely separate actors from the parent corporation and could in fact form a RICO association-in-fact enterprise with it.

The next issues presented were whether the repleaded complaint alleges a pattern of racketeering activity and whether the predicate acts of racketeering necessary to support a RICO claim have been alleged with the requisite particularity lacking in the dismissed complaint. The repleaded allegations offer a decidedly greater particularity curing the pleading deficiencies identified in the first amended complaint. The repleaded RICO claims are therefore held to be nonfutile, and the second amended complaint may be filed. However, the securities law claims and the RICO predicate acts founded on alleged violation of securities laws must be dismissed or stricken from the second amended complaint.

Finally, the court recognizes that this ruling has involved a number of controlling questions of law on which there is substantial ground for difference of opinion. Therefore, the court deems this matter appropriate for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Nothing in this court's order shall be construed as staying the proceedings pending interlocutory appeal.

As to procedural matters flowing from the grant of leave to file the second amended complaint, the court recognizes that the parties may wish to limit discovery to targeted issues raised in this ruling preparatory to the filing of a motion for summary judgment. The court would therefore entertain a motion for limiting discovery, if made within **forty-** five days of the date of this order, and would set such a motion for hearing to determine the targeted issues and necessary period for discovery. Additionally, the plaintiffs shall have **thirty days** to amend the second amended complaint to allege a purpose for the first-phase enterprise in accord with the purpose asserted for this enterprise in plaintiffs' brief. The court also reminds the parties that pursuant this court's certification of the appropriateness of an interlocutory appeal under 28 U.S.C. § 1292(b), any application for interlocutory appeal of this order must be filed within ten days of the date of this ruling.

**IT IS SO ORDERED.**